In the matter of the probate of the last will and testament of GEORGE F. JOHNSON, deceased.

[Argued June 26th, 1912.  Decided November 18th, 1912.]

No. 78.  Appeal of Kate Cabaniss from decree of prerogative court.

No. 79.  Appeal of Mary J. Winfield and others from same decree.

These are two appeals from a decree of the prerogative court advised by Vice-Chancellor Walker, affirming a decree of the Union county orphans court, admitting to probate the last will and testament of George F. Johnson, deceased.  The reasons which led the orphans court to admit the will to probate are set forth in the following opinion of

ATWATER, PROBATE JUDGE:

"George F. Johnson died at Mountainside, Union county, New Jersey, June 1st, 1910, in the seventy-eighth year of his age. He was a widower, without children, and had lived at Mountainside on a farm since the year 1905. He called his farm 'Place Villa Johnson.' There was a dwelling-house on the farm which he occupied alone since the death of his wife in 1907; his attendants being a Frenchman named Henri and his wife. Mr. Johnson had a foreman, or manager, for the farm, named Stewart M. Hazlett, who lived with his wife in a small dwelling on the premises. Hazlett had occupied the position since November, 1909, succeeding some other foreman.

"Mrs. A. Josephine Smith, a cousin of Mr. Johnson's wife, frequently visited the home of Mr. Johnson. She testified that she had known Mr. Johnson since she was seven years of age, but that she did not visit at Mountainside until after Mrs. Johnson's death, owing to her occupation and absence from the country, and that she was there infrequently until Mr. Johnson's illness, which began in September, 1909, and then she devoted as much time as she could possibly give him. Her visits were generally made on Wednesday and Saturday, she spending Wednesday night and Saturday and Sunday there.

"Letters were produced, written in 1904, 1905 and 1906, from Mr. Johnson's wife to Mrs. Smith, showing that their relations were of the friendliest kind. Letters were also produced from Mr. Johnson to Mrs. Smith, which show that their relations were also friendly, the latest bearing date September 16th, 1909.

"Mr. Johnson had spent the greater part of his business life in New York City, where he was engaged in the produce commission business, and during the last twenty-five or thirty years of his life he was a general agent of the Equitable Life Assurance Society.

"Mr. Johnson's relatives living at the time of his decease were his sister, Jennie, wife of Judge Morris Winfield, a lawyer, practicing in Logansport, Indiana; a brother and nephews and nieces. I think the weight of the evidence is that Mr. Johnson

had no special affection for these relatives. He was hospitable and was frequently visited by his neighbors.

"A paper (or rather four sheets of paper not fastened together), purporting to be his last will and testament, bearing date December 23d, 1909, was produced in the surrogate's office by Mrs. A. Josephine Smith, the executrix named therein.

"Caveats have been filed by Mr. Johnson's sister, Mrs. Jennie Winfield, wife of Judge Morris Winfield, and heirs and next of kin.

"Mr. Johnson was taken ill in September, 1909, and from that time on was confined to his house. He suffered from a complication of diseases which affected his breathing to such an extent that he was obliged to remain in a sitting posture and could not lie down to sleep. His feet and legs became swollen and locomotion was very difficult for him. At the time of executing the document in question he was confined to the second floor of his house and hardly able to move from one room to another.

"It appears from the admission of counsel that the estate is valued at about $75,000, subject to a deduction of $10,000 for indebtedness.

"*Execution of the Will.*—The evidence seems to be decisive that the document was executed in Mr. Johnson's bedroom between nine and ten A. M. on December 23d, 1909. This is the date written on the will in Mr. Johnson's handwriting. Stewart M. Hazlett, one of the witnesses to the will, says it was executed on Christmas day, December 25th, 1909. I think he is mistaken.

"Dr. Wright, the other subscribing witness, testifies that he called on the morning of December 23d and that Mr. Johnson asked him to witness his will. He further testifies that Mr. Johnson spoke of having a Mr. Badgley, a neighbor, as the other witness, but that Mr. Badgley was not available at the time. Then the doctor suggested that Mr. Hazlett, the foreman on the farm, be called, and that he was summoned. When Mr. Hazlett came into the room Dr. Wright testifies that he told him, in testator's presence, that Mr. Johnson wished him to witness his will.

"Mrs. Smith testifies, referring to Hazlett coming into the room of Mr. Johnson just before the will was signed:

" '*Q.* He bid him good morning?
" '*A.* As I recall it, it is as Mr. Hazlett came in in the room with a look of inquiry on his face, Mr. Johnson said to him, "I want you to witness my signature to a paper."
" '*Q.* Mr. Johnson said that?
" '*A.* Yes, sir.'

"When the paper was executed there were present Mr. Johnson, Dr. Wright, Mr. Hazlett and Mrs. Smith.

"Mrs. Smith produced the four sheets and then Mr. Johnson signed the last one, the sheets being all together, but not fastened. Dr. Wright testifes that Mr. Johnson signed the will and dated it. He wrote as follows:

" 'George F. Johnson,
Place Villa Johnson,
Dec. 23rd, 1909.'

"Dr. Wright also testifies that he and Hazlett were standing in front of or at the angle of testator's table and that they both saw him sign it.

"I quote from Dr. Wright's testimony as to what next occurred:

" '*Q.* You stepped forward, you said?
" '*A.* Yes, sir, I stepped forward as he lay back exhausted, after he had signed his name, and as I did so he gave me to understand that I was there to witness his signature.
" '*Q.* What did you say?
" '*A.* Then I took the pen, and in doing that I said, before signing my name to the paper, I said, to Mr. Johnson, "Mr. Johnson, you acknowledge this to be your last will and testament" and I said "I want to know what I am signing"—and he said "he did."
" 'By Mr. Voorhees.
" '*Q.* He said he did what?
" '*A.* He said, "I do."
" 'By Mr. Gilhooly.
" '*Q.* Was there anything said about the witness?
" '*A.* And then I said, "And this, I understand, I am witnessing and you acknowledge this to be your last will and testament, and I am to sign as a witness."
" '*Q.* Was there anything said about Mr. Hazlett signing it?

" '*A.* No, nothing was said about Mr. Hazlett signing it, only I stepped back and handed the pen to Mr. Hazlett, or he took the pen, I don't know which, and then Mr. Hazlett signed his name to the paper as a witness.'

"Hazlett testifies that Mr. Smith produced the four sheets and that he saw Mr. Johnson sign one of them. I quote from Hazlett's testimony:

" '*Q.* After Mr. Johnson signed that paper, did not Dr. Wright say to Mr. Johnson, "Do you acknowledge this to be your last will and testament?"

" '*A.* He did, yes, sir.

" '*Q.* You heard Dr. Wright say that?

" '*A.* Yes, sir.

" '*Q.* And what did Mr. Johnson do then?

" '*A.* Mr. Johnson made no reply, but hung his head on his little table like that [illustrating].

" '*Q.* Didn't he nod his head?

" '*A.* No, sir; he did not.

" '*Q.* Dr. Wright said Mr. Johnson replied "Yes, I do?"

" '*A.* No, sir; he never made any reply.

" '*Q.* You do not agree with Dr. Wright in that then?

" '*A.* No, sir, decidedly not.

" '*Q.* And Dr. Wright says that Mr. Johnson said "I ask you to be my witnesses?"

" '*A.* No, sir.

" '*Q.* You didn't hear him say that?

" '*A.* No, sir.

" '*Q.* After Mr. Johnson signed, who signed next?

" '*A.* Dr. Wright.

" '*Q.* Did you see Dr. Wright sign?

" '*A.* Yes, sir.

" '*Q.* After he signed, who signed next?

" '*A.* I signed.

" '*Q.* And you signed in the presence of Dr. Wright and Mr. Johnson, didn't you?

" '*A.* Yes, sir.'

"The counsel for the caveators admitted on the argument that the paper-writings offered as the last will of George F. Johnson has been executed and published in accordance with law. After the witnesses for the proponents had given their testimony on that phase of the case I permitted the said paper-writings to be offered in evidence. A further consideration of the evidence confirms my opinion that the document was duly executed in

34

conformity with the provisions of the New Jersey statute re-
lating to wills. The only testimony which militates against this
conclusion is that of Hazlett. I am satisfied that when he came
into Mr. Johnson's room on the morning of the execution of the
will, he was informed either by Dr. Wright, or Mr. Johnson, the
testator, that he was wanted to witness a paper; that the execu-
tion of the will was forthwith proceeded with; that sufficient
publication was made in his presence and hearing, and that he
saw testator sign and also Dr. Wright, and that he, Hazlett,
immediately signed in their presence. See *Ayres* v. *Ayres, 43
N. J. Eq. (16 Slew.) 565, 571, 572,* and cases cited. It will be
seen from the testimony that Hazlett immediately took a posi-
tion antagonistic to the will—that is, he forthwith expressed the
opinion that it was not a valid document.

"*Document in Four Sheets.*—As this document consists of
four sheets, which were not fastened together and only one of
which was signed by the testator, a question arose as to whether
these four sheets were in fact before the testator and consti-
tuted the document which he published as his will. As the four
sheets offered in evidence are in the handwriting of Mrs. A.
Josephine Smith, she became a very important witness on the
subject, and she was examined and cross-examined at length.
She testifies that they are the same four sheets of paper, and it
is to be said that there is no evidence to the contrary.

"Joseph M. Wright, one of the subscribing witnesses, is quite
positive that the papers are the same which he witnessed. He
did not read them.

"Stewart M. Hazlett, the other subscribing witness, says there
were four sheets. When asked whether the sheets offered were
the same sheets he saw that day he said, 'I can only vouch for
the one, that is the one I signed.' He says he didn't see the
writing.

"After hearing the witnesses I was satisfied as to the identity
of the papers.

"The contents of the papers sustained this conclusion. The
evidence shows that Mr. Johnson had long had in mind to erect
a hospital in Logansport, Indiana, in memory of his parents.
This was his birthplace and the place where the early part of his

life was spent. The will is crudely drawn, but the purport of it is that the bulk of his property shall go to the establishment of a hospital in Logansport in memory of his parents.

"A paper was offered in evidence which the testimony shows was in the handwriting of Mr. Johnson. It was written with lead pencil. It was found among his papers. It was an incomplete draft of a will, in which he is named as testator. This paper contains a provision for the erection of a hospital in Logansport and deals with the subject in much the same way as the will in question. It also contains a provision for the benefit of Mrs. George W. Miles similar to that of the will in question.

"There is also a provision for an annuity for Mrs. George W. Miles, a sister of his wife, who was in destitute circumstances. Mr. Johnson had for a number of years prior to his death contributed $33 per month to her support.

"Abner T. Bowen is one of the executors named. From Mr. Bowen's testimony it appears that Mr. Johnson had asked him to be his executor some five or six years before. They had been acquainted since 1892 and their relations appear to have been of a very friendly nature.

"It will be seen therefore that in the respects named, viz., hospital, Mrs. Miles, Bowen, as executor, the will is consistent with previously expressed views of the testator.

"Mrs. Smith is made executrix of the will. This clause is not on the signed sheet, but on this sheet reference is made to 'the executor and executrix.'

"The jewelry, clothing and other personal effects of testator's wife, who died in 1907, are given to Mrs. Smith. Testator also gives to her such part of his furniture and personal effects 'as she may wish to retain.'

"A reference is made in the will to some indebtedness of 'The Mrs. Smith Co.,' which is the name under which Mrs. Smith was doing business in New York. The amount of the indebtedness is *seven* or eight hundred dollars. The reference to this indebtedness does not discharge it, but appears to have the effect of allowing some extension of time in payment.

"An examination of the document, and a consideration of its contents, in the light of testator's previously expressed views and

purposes seem to me to make the supposition that any change had been made in it after its execution or any sheet or sheets substituted incredible.

"My conclusion in regard to this part of the case can be expressed in the language of the court in the case of *Ela* v. *Edwards, 82 Mass. (16 Gray) 91*, as follows:

"'In the present case the different papers are obviously connected in their provisions, and are sufficiently shown to have composed a connected series and the same that are shown to have been attested by the witnesses.'

"It was not contended that a will might not be lawfully executed, although written on detached pieces of paper, but it was contended that a document so composed affords opportunities for fraud, and the evidence should be very carefully considered and great caution exercised before admitting such a document to probate. This proposition is indisputable. There is nothing in the law of New Jersey requiring each sheet to be signed, however wise a precaution it might be.

"In *Schouler Wills (3d ed.)* § *284*, the author says:

"'A will may, of course, be written on several sheets of paper incorporated together in sense as one instrument. And, unless the local statute provides differently, the will is well signed and attested on the last sheet alone, provided the execution was *bona fide* and meant to cover the whole.'

"*Mental Capacity.*—It is claimed by caveators that testator had not sufficient mental capacity to make a will, at the time of the execution of the document in question.

"He was in very feeble health at the time, suffering from very serious physical infirmities, the results of disease.

"Mr. Johnson had been an active business man up to the time of his last illness. He was a man of unusual mental vigor and force of character. It is claimed, however, that his faculties had failed to such an extent that he was disqualified on that account from executing a will.

"The witnesses produced on this point are Judge Winfield, the Hazletts, Miss May E. Lewis, who was stenographer for the testator the last two years of his life, and Mr. Zopher D. Hawkins.

"Judge Winfield is the husband of the sister of Mr. Johnson, a lawyer by profession and at one time a judge in the State of Indiana, and a man of ability and discrimination. He expresses the opinion that Mr. Johnson was incompetent to make a will. He had not seen Mr. Johnson since 1906. He made a visit to him in January, 1910. He refers to the physical condition of Mr. Johnson; to the change in his mode of dress, he having formerly been a man fastidious in this respect, and at the time he saw him he was quite the reverse. He also refers to certain statements made by Mr. Johnson in regard to the value of his farm; in regard to the prospects of realizing from the peach crop; in regard to the prospects of the candy business in which Mr. Johnson had an interest and other matters going to show that Mr. Johnson had exaggerated ideas on this subject. I think, however, a careful reading of Judge Winfield's testimony will show that in his conversation with Mr. Johnson, the latter manifested mental capacity; ability to reason and powers of memory. It seems to me that in these conversations Mr. Johnson showed ability to carry on conversations; to talk reasonably on the matters which formed the subject of the conversations. While it may well be said that he did not manage his business affairs with all the skill and care that he would have shown a few years previous, yet, nevertheless, he showed capacity to understand Judge Winfield's criticisms. According to the judge's own testimony Mr. Johnson resented what he called prying into his affairs by Judge Winfield.

"Judge Winfield testifies as to a conversation with Mr. Johnson on one of the judge's visits in 1910. He testifies to the effect that he explained to Mr. Johnson why it would be inexpedient to erect a hospital in Logansport, Indiana, one reason being that he did not think the city of Logansport would take upon itself the burden of supporting the hospital. He further testifies that Mr. Johnson said, 'I have given up the idea of the hospital.' According to Judge Winfield's testimony, Mr. Johnson comprehended the reasoning of Judge Winfield and adopted it. From Judge Winfield's testimony it seems quite clear that Mr. Johnson understood Judge Winfield's point of view in regard to

the hospital and treated it as a man of intelligence naturally would.

"I think the same may be said of the testimony of the Hazletts and Miss Lewis.

"Zophew L. Hawkins had known Mr. Johnson for twenty-nine years; was employed by him in 1881 and 1882 and had kept up his acquaintance. He testifies that in the summer of 1909 Mr. Johnson asked him to be his executor, but did not say anything about the nature of his will, or how he proposed to dispose of his estate.

"He testifies that he saw Mr. Johnson in the early part of December, 1909. His description of Mr. Johnson's physical condition corresponds with that of the other witnesses. He says, 'He [Mr. Johnson] was, I should say, in his dotage.' 'I thought he was erratic in *everything*.' Mr. Hawkins testifies to being with Mr. Johnson some two hours and conversing with him on various subjects.

"Alfred E. Pearsall, a man sixty-five years old, living at Mountainside, had been somewhat intimate with Mr. Johnson after the latter came to Mountainside. He saw him in the early part of 1910. He testifies in detail and gives strong testimony as to Mr. Johnson's mental capacity.

"To a like effect is the testimony of Mrs. Alfred E. Pearsall.

"James A. Buck, who resides at Mountainside, and who is connected with the Equitable Life Assurance Society, and who had known Mr. Johnson for about sixteen years, gives testimony as to calling on Mr. Johnson at his home in Mountainside some few times. The last time he saw him was about a month prior to his death. He refers to conversations that he carried on with him then and testifies that he did not notice any impairment of his faculties. He says he noticed difficulty of speaking. He thinks he saw him between Christmas and New Years, and testifies that he had conversation with him then, and that he did not notice any impairment of his faculties.

"Henry Hale, who lives at Orange, New Jersey, and who had known Mr. Johnson in connection with the life insurance business, testifies to two interviews with Mr. Johnson; one visit was about Thanksgiving, 1909, and the other in February, 1910, and

he refers to conversations had with him on those occasions, and to his talking about different matters. He testifies that he could sustain a conversation.

"Dr. Wright, his medical adviser, testifies that he saw Mr. Johnson every day from the latter part of September, 1909, until the 15th or 16th of March, 1910. He is very positive as to Mr. Johnson's mental capacity; that his mind was clear and that he did not show any lack of mental vigor up to the time of the making of the will.

"Louis Rath, fifty-four years old, residing at 309 Seventh avenue, New York, testifies as to a conversation with Mr. Johnson before he died. He testifies as to his ability to keep up conversation and his understanding of the conversation. The conversation related to the sale of some property by Mr. Johnson to Mr. Rath. He testifies to seeing him in May just before he died, also the previous 4th of January, also on February 16th and 24th. While he found Mr. Johnson in very bad condition physically, he found him able to discuss matters of business and did not observe any impairment of his mental faculties.

"Paul Q. Oliver, thirty-seven years old and a counselor-at-law of this state, residing at Westfield, New Jersey, testifies that he saw him in his last illness and had a little business matter for him. He saw Mr. Johnson in the winter of 1910. He fixes it as after the time of Mr. Pearsall's return from Florida. He observed him particularly with reference to his capacity for making a will and he testifies that he certainly would have felt warranted in making a will for him if he had been asked to do so. The evidence shows that Mr. Pearsall returned from Florida after the opening of the year 1910.

"Edward J. West, age thirty-five, residing in Long Island, a counselor-at-law, became acquainted with Mr. Johnson in May or June, 1907, and acted as counsel for Mr. Johnson. He testified that in the fall of 1907, or early in 1908, he talked with Mr. Johnson about his will, and Mr. Johnson then stated he wanted to leave all his property to establish a hospital in Logansport, Indiana. Mr. West had frequent interviews with Mr. Johnson. He saw Mr. Johnson in September, 1909, after he was taken sick. Mr. West testifies that he wanted to talk over his

will .and plans for the hospital with him and Mrs. Smith, and that he wanted Mrs. Smith to have the furniture or whatever there was in the house, and he wanted her to have Mrs. Johnson's personal effects. He testifies to an interview October 10th, in which the subject of the candy factory was discussed. He testifies to seeing him December 8th, when the subject of the claim of a Dr. Godson was discussed. He also saw him on February 13th, 1910, and discussed certain matters of business with him. He testifies as follows:

" 'Q. What was Mr. Johnson's condition on the.visit of February?

" 'A. He seemed perfectly clear, I think, if anything, a little better than he had been when I saw him in December; he seemed quite vigorous and took hold of things, and I was a little surprised at the way he kept up with things. He told me about his plans for the farm.'

"Mr. West in his visits to Mr. Johnson during the time of the latter's illness discussed business matters with him and matters of business were decided upon.

"My conclusion is that under the rules laid down in this state, Mr. Johnson at the time he executed the paper in question had sufficient capacity to make a will.

"*In re Carter's Will, 51 Atl. Rep. 65*, it appeared that the testatrix was about eighty-one years of age, and from an injury to her hip, was somewhat of an invalid and was unable to read or write; it was, however, shown that she was thoroughly conversant with her own affairs and with the kind and value of her property, and with a full knowledge of the number and degree of kinship of her relations, and it was held that she had mental capacity to make a will.

"In the case of *Bennett* v. *Bennett, 50 N. J. Eq. (5 Dick.) 446*, it is said that—

" 'If .he [the testator] is capable of recollecting of what his property consists, and who, either in consequence of ties of blood or friendship, should be the objects of his bounty, and has a mind sufficiently sound to enable him to know and to understand what disposition he wants made of his property after his death, he is competent to make a valid will.'

"In my opinion, Mr. Johnson was competent within the meaning of the definition given in the *Bennett Case*. The presumption of the law is in favor of capacity and the burden of proof is upon those who assert to the contrary. See *McCoon* v. *Allen,* *45 N. J. Eq.* (*18 Stew.*) *708, 719; Elkinton* v. *Brick, 44 N. J. Eq.* (*17 Stew.*) *154, 158.* I think in this case the caveators have not showed a lack of capacity in Mr. Johnson.

"*Undue Influence.*—It is quite plain from a study of the testimony that if any undue influence was exercised upon Mr. Johnson, which resulted in the execution of the document in question, that such influence was brought to bear by Mrs. A. Josephine Smith. I have already referred to the acquaintance and relations which existed between Mrs. Smith and Mr. Johnson. These relations appear to have been of a most friendly nature. Her visits to him were largely after the time that he was taken ill, although her acquaintance with him and his wife, prior to the wife's death, appear to have been rather intimate. It can properly be said that Mr. Johnson liked Mrs. Smith, and it was agreeable to him to have her at his house, and that he trusted her with the performance of various services for him in connection with his business, and he had loaned her money in connection with her business. It is plain that she wanted him to make a will and she gives the reason for it that she wanted him to provide for Mrs. Miles, a cousin of his wife, who was in destitute circumstances and to whose support he had been contributing for a number of years.

"In *Bennett* v. *Bennett,* already referred to, it was said:

" 'No matter if the will is drawn by the principal or even sole legatee, if it is made by a testator possessing adequate capacity, and it is shown that he knew its contents when he published it, and it appears to have been executed in the manner prescribed by the statute, the court must, in obedience to the law of the land, uphold it as the will of the testator and admit it to probate, unless satisfactory evidence is produced showing that it is the product of fraud.'

"Here, again, it is necessary for the party alleging undue influence to prove it. See *Dumont* v. *Dumont, 46 N. J. Eq.* (*1*

*Dick.*) *223, 230;* also *Schuchardb* v. *Schuchardt, 62 N. J. Eq.* (*17 Dick.*) *710, 713.*

"In the case of *Haydock* v. *Haydock, 33 N. J. Eq.* (*6 Stew.*) *494, 496,* Vice-Chancellor Van Fleet said:

"'The extent or the degree of influence is quite immaterial, for the test always is, was the influence, whether slight or powerful, sufficient to destroy free agency, so that the act put in judgment was the result of the domination of the mind of another rather than the expression of the will and mind of the actor.'

"Now, as to the contents of the will, it appears clearly that Mr. Johnson had already expressed the purpose of establishing a hospital in Logansport. I think it also quite clearly appears that he had indicated the purpose of providing for Mrs. Miles. The provision for her is no greater than the amount he had been contributing for her support during his lifetime. As to the provision for Mrs. Smith, it appears from the testimony of Mr. West that he had indicated to him his desire that she should have as much of his furniture as she wanted, and that she should have his wife's clothing and other personal effects. There is nothing unreasonable in his making the provision in regard to Mrs. Smith's indebtedness so that its immediate collection might not be enforced. Mr. Bowen testifies that he had asked him to be an executor. Mrs. Smith is also named as executrix. So far as this feature of the will is concerned, I do not recall any testimony going to show that Mr. Johnson had spoken to anyone of his purpose to appoint Mrs. Smith an executrix. It does not seem to me that Mr. Johnson in making this will was dominated by Mrs. Smith. I think that a man of the mental force that he is shown to have had would not have been dominated by anyone, and the circumstances do not show that at the time he made the will he was under any sort of duress. It is quite probable, and I think it is a fact, that he regarded the will as a temporary arrangement, and that he intended when he recovered his health, as he seemed to have been strongly of the opinion that he would, then to have another will drawn by a lawyer.

"In the *Schuchardt Case,* above referred to, it was said:

"'It must be made to appear, either expressly or by justifiable and fair inference from circumstances proved, that such influence

was, in fact, exerted, and that it was so exerted as to dominate and control the will of testator and coerce him to make a testamentary disposition of his property which he would not otherwise have made.'

"It seems to me that no such condition existed in the case under consideration and that there was no domination of the will of Mr. Johnson by Mrs. Smith.

"A decree will be entered admitting to probate the paper offered as the last will of George F. Johnson."

*Messrs. McDermott & Enright* and *Mr. Benjamin F. Long* (of the Indiana bar), for the appellants.

*Mr. Patrick H. Gilhooly,* *Mr. Richard Boardman* and *Mr. Edward J. West* (of the New York bar), for the respondents.

PER CURIAM.

The decree of the prerogative court will be affirmed, for the reasons stated in the foregoing opinion delivered in the orphans court. The respondent's costs in this court shall be paid by the appellants.

No. 78—

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, BERGEN, VOORHEES, MINTURN, KALISCH, BOGERT, VREDENBURGH, CONGDON, TREACY—12.

*For reversal*—None.

No. 79—

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, BERGEN, VOORHEES, MINTURN, KALISCH, BOGERT, VREDENBURGH, CONGDON, TREACY—12.

*For reversal*—None.