OF

## THE STATE OF NEW JERSEY,

## ·1914.

EDWIN ROBERT WALKER, ORDINARY

JOHN R. EMERY, FREDERIC W. STEVENS, EUGENE STEVENSON,
EDMUND B. LEAMING, JAMES E. HOWELL, VIVIAN M.
LEWIS, JOHN H. BACKES AND JOHN GRIFFIN,
VICE-ORDINARIES.

In the matter of the probate of a paper-writing purporting to
be the last will of ELIZABETH W. TUNISON, deceased.

[Submitted February 16th, 1914. Decided May 18th, 1914.]

1. The "undue influence" which vitiates a will is that which destroys
free agency and constrains testator to do what is against his will and
what he would not have done if left to himself, and the degree of the in-
fluence is immaterial, provided it destroys free agency.

2. The undue influence which vitiates a will must be an ·influence
whereby someone is materially injured, and where testator divided his
property equally among his children, or approximately so, there can be
no complaint of undue influence.

3. In proceedings for the probate of a will, contested on the ground of undue influence, evidence *held* not to show such influence as deprived testatrix of her free agency, in view of the fact that all her children were substantially treated alike and the reduction made by the will in the share of a child was based on reason, operating on the mind of testatrix.

4. A gift by testatrix to a child about three months before the execution of her will, while she was in possession of all her faculties, and agreed to by two of her other four children as fair, could be proved in proceedings by the child to probate the will, contested on the ground of undue influence.

5. Where a will was contested on the ground of undue influence exerted by a child over testatrix, evidence that about a year and a half after the execution of the will she conveyed to the child real estate and personal property had but little weight on the issue.

6. The court, in proceedings for the probate of a will, may not consider the validity of gifts *inter vivos* made by testatrix to a child.

7. Mere opportunity to exert undue influence in procuring a will, coupled with an intention to do so, is not sufficient to show undue influence, where testatrix is of ordinary and usual mental capacity, though her mental capacity has been weakened by old age or disease, and there must be some positive evidence that someone actively exerted influence of an undue character, having some effect on the mind of testatrix.

On appeal from the orphans court of Essex county.

*Mr. Henry C. Hunt* and *Mr. Alfred F. Skinner,* for the appellant.

*Mr. Cortlandt Parker, Jr.,* and *Mr. R. Wayne Parker,* for the respondents.

HOWELL, VICE-ORDINARY.

Mrs. Elizabeth W. Tunison died in February, 1911, leaving her surviving four children—Benjamin C. Tunison, William E. Tunison, Clarence W. Tunison and Ella T. Sargent. Benjamin C. Tunison was and is a non-resident; the other three reside in New Jersey.

On March 1st, 1911, Clarence W. Tunison produced his mother's will before the surrogate of the county of Essex; on that day the same was admitted to probate and letters testamentary were issued to the said Clarence W. Tunison as one of the executors appointed by the will. On March 3d following, Wil-

liam E. Tunison, the other executor, applied for letters testamentary, and the same were on that day issued to him.

In July, 1911, Benjamin C. Tunison appealed from the order of the surrogate admitting the will to probate, and the case came on for hearing *de novo* before the orphans court in January, 1912.

The orphans court reversed the action of the surrogate by an order entered April 25th, 1913. By this order the said will was rejected and a counsel fee of $1,500 was allowed to the proctors for the appellants, and a like fee of $1,200 to the counsel of the respondents, besides the costs of suit of both parties, including the stenographic copies of the evidence. The proponent then appealed to this court from that part of the decree which rejected the will, and Benjamin C. Tunison appealed from that part of the decree which allowed a counsel fee and costs to the proponent, and also from such part of the decree as directs that the costs and counsel fees of both parties, including stenographic copies of evidence, should be paid from the estate, instead of being paid by the proponent personally.

The due execution of the will is not questioned. The only attack made upon it is upon the ground that the testatrix was unduly influenced to make the will by her son Clarence W. Tunison, with whom she lived, and who, at the time the will was made, was almost her sole companion, caretaker and adviser. The property devised by her will came to her under the will of her husband, who was a clergyman affiliated with the Methodist Episcopal Church. His will was made November 26th, 1887. By it he devised and bequeathed to his wife, Elizabeth W. Tunison, all his real and personal property, to be held, used and disposed of by her according to her will and pleasure, but that if at her death there was any property that had not been used or disposed of by her either by will or otherwise he directed that the same should be divided equally among his five children, being the four above mentioned, and one daughter, Alice B., who has since died, but with a single exception that Benjamin C. should receive $2,300 less than either of the other children on account of advancements theretofore made to him, and also directing that the Florida farm should be transferred to Ben-

jamin at the price and value of $1,800. The widow (the present testatrix) and the sons William and Clarence were the executors. The two sons alone qualified.

The will in question in this suit was executed by Mrs. Tunison on the 26th day of June, 1908. By its terms she provided for her son Benjamin C. and his family as follows: (1) She gave to Benjamin C. the income on $2,500 for the term of his natural life, and (2) in the event of his death the executors should pay from the principal thereof the sum of $500 to Nellie, his wife, and (3) $500 to her grandson George, son of Benjamin C., with remainder over to her other three children in case the said Nellie or George should depart this life before said Benjamin. She likewise provided (4) that her granddaughter Beatrice, daughter of Benjamin, should have the income on $1,250 until she arrived at the age of twenty-one years, at which time the principal should be paid to her, with the remainder over to the other three children, in case the said Beatrice should depart this life before arriving at the age of twenty-one years. She likewise provided (5) that Alice Tunison, daughter of Benjamin C., should have the income on $1,250 until she should attain the age of thirty years, but that in case she accepted the Roman Catholic faith or became a member of the Roman Catholic Church she should forfeit the said sum of $1,250 and the same should go to her three remaining children; all the rest, residue and remainder of her estate should go to her three remaining children—William E., Clarence W. and Ella T.; she appointed William E. and Clarence W. to be the executors thereof.

It is claimed on the part of Benjamin C. Tunison that his mother was induced by the undue influence of his brother Clarence to make a meagre and limited provision for him and members of his family in order that he (Clarence) might benefit thereby. Mrs. Tunison, at the time of the execution of the will, was about eighty-three years of age. For some time prior thereto she had been an invalid, confined to her house, and part of the time to her bed; her constant companion and nurse was her son Clarence, who looked after her wants, assisted her in her illness and in her business affairs, and to a large extent might

be called her confidential companion and adviser, and he seemed at times to have resented the desire of the other members of her family to see her, and occasionally made it somewhat awkward for them to do so. Under these circumstances, it may well be said that it was his duty to refrain from attempting to influence his mother in any way in the disposition of her property. William E. Tunison lived in the same town in which Clarence and his mother lived; he visited his mother occasionally during her last illness, and was not on intimate terms with his brother Clarence; there was especially bad feeling between William's wife and Clarence. Mrs. Sargent lived a considerable distance from the other members of the family, and did not see them so frequently as did William. So far as I can ascertain, from the testimony, Mrs. Tunison had no animosities against any member of her family, nor does it appear that she ever expressed herself as more favorable to one than to another.

In this case the charge of undue influence on the part of Clarence arises from the fact that he lived with her and was her constant companion, and that the circumstances show that he was in such a situation as to her, and held such a confidential relation toward her, that the burden of proof is shifted to him, to make clear to the court that his actions were free from any attempt to influence her against any of her children. Vice-Chancellor Van Fleet has furnished us with a definition of undue influence which seems to be very complete. He says, in *Earle* v. *Norfolk Company, 9 Stew. 188:* "All that can be safely said in the way of formulating a definition of what the law calls undue influence is to say that whatever destroys free agency and constrains a person whose act is brought in judgment to do what is against his will and what he would not have done if left to himself, is undue influence, whether the control be exercised by physical force, threats, importunity or any other species of mental or physical coercion. The extent or degree of the influence is quite immaterial, for the test is, was the influence, whether slight or powerful, sufficient to destroy free agency and render the act brought in judgment rather the result of the determination of the mind of another than the expression of the mind of the actor."

The term "undue influence" has no force or efficacy unless by means of such influence somebody is materially injured. It could hardly be said that a man was unduly influenced to make a will by which he divided his property equally among his children for the reason that in such a case it could not be said that anyone was injured. If, therefore, we find in this case what is approximately an equal distribution under the will, then there can be no complaint of undue influence, or if this equal, or approximately equal division shall be varied in the case of one or more of the children, and a good reason for such variance appears, then and in such case it could hardly be said that the element of undue influence had any operation. It may be borne in mind that the opponent, Benjamin C., had been advanced a considerable sum of money in the lifetime of his father. By the will of the father he was to have been charged with the sum of $2,-300, with interest, from November 26th, 1887. In 1906 the present testatrix, Mrs. Tunison, made an earlier will which is in evidence, in and by which she charged her son Benjamin with $8,800, which was approximately the amount charged against him by his father's will, plus interest to the date of his mother's will. This amount calculated to the date of the mother's last will, with the interest, would amount, roughly, to $10,000, and inasmuch as it appears that both the father and the mother by the wills just mentioned intended to charge up this amount against him, it might not appear inequitable and unjust if the testatrix had the situation and the figures in mind at the time her second and last will was executed. I think we shall have to take it for a fact in the case that she intended to charge up. either directly or indirectly, this amount which had been so advanced by her husband to her son, with interest. This sum, with interest added to the amounts appropriated to the benefit of Benjamin and his family by her last will, would approximate $15,-000; and if it shall appear that that amount is approximately one-fourth of the value of the estate, then, in my opinion, the attack upon the will on the ground of undue influence must fail.

The evidence shows that at the time of the execution of the will in question the value of the personal estate of the testatrix

83 N. J. Eq.　　　　　In re Tunison's Will.

was about $40,000. This was subsequently increased by extra dividends on some of the investments, so that at her death it was much larger. The real estate owned by the testatrix at the time of her death seems to have been worth not far from $13,000. If these figures are correct, then the amount of money appropriated to Benjamin and his family at the time of the execution of the will was not far from a one-fourth share of the whole estate. It is true that the bequests are not all absolute, but, with one exception, are either for life or upon condition, but it is quite apparent that a reason existed at that time for making a distinction between Benjamin and his family on the one hand and the other three children of the testatrix on the other hand. Benjamin was an unthrift; he is spoken of by some of the witnesses as a wanderer. The evidence hints at, and partly discloses, a situation with regard to him which is hardly in accord with the moralities which might naturally be insisted upon in the family of a clergyman of a Christian denomination. He had been divorced from his first wife; was separated from his second wife, had left his home, and for a time had taken up his residence in Florida, and subsequently in western Pennsylvania. He was not in immediate touch with members of his family, and seldom communicated with them by letter or otherwise. His daughter was being educated in a Roman Catholic school and was evidently suspected of a desire to join the Roman Catholic Communion, which I think the evidence shows she subsequently did. These circumstances point out a reason why the testatrix made for Benjamin and his family the somewhat limited provision which she did make, a provision which, it seems to me under all the circumstances of the case, was a natural and almost necessary outcome of the circumstances and of the relationship which Benjamin bore to the rest of the family. Under these circumstances can anyone say that this will was produced by undue influence of Clarence? It seems to be satisfactory to the other members of the family. William approved of it by taking letters testamentary under it; Mrs. Sargent especially approved of it on the witness-stand; they are equally interested with Clarence in the division of the estate. If he had intended to influence his

mother, and had the power to do so, as is claimed by the opponent of the will, there seems to be no reason why he should not have procured a larger interest for himself and also have deprived William of any share in the administration of the estate.

My conclusion on this branch of the evidence, therefore, is that there is no proof of any undue influence, or of any sinister influence cogent enough to have deprived the testatrix of her free agency in the disposition of her property by her will.

It appears, however, by the testimony that the testatrix did favor Clarence by the transfer to him of considerable real and personal property by documents which were not testamentary in their character. On March 10th, 1908, about three months before the will was executed, she transferred to him two mortgages of the aggregate amount of $2,500, and on December 15th, 1909, a year and a half after the execution of the will, she conveyed to him the real estate which I have said was valued at $13,000, and about six weeks later she transferred to him by bill of sale all the contents of her house. And it likewise appears in the case, or on the argument was mentioned by counsel, that proceedings are pending in another court to set aside these transactions and bring this property back into the estate for distribution. It was urged with great vigor that these gifts were evidence of the undue influence which it is alleged Clarence had over his mother. I do not think so. It sufficiently appears that the testatrix was in possession of all her faculties at the time the mortgages were assigned, and that the assignment was approved of by both Mrs. Sargent and William, who agreed that it was only fair that Clarence should be compensated for the care and attention which he had bestowed upon his invalid mother. The other two transactions occurred so long after the making of the will as to be of little service in adjudicating upon her mental condition at the time of the execution of the will. It is quite possible that a person might be competent to execute a will on a given day and a year and a half later be absolutely incompetent.

I do not mean to be understood as either approving or disapproving these transactions. The question of their validity cannot be considered in this cause. The action of a court of equity

in dealing with the question of the validity of gifts *inter vivos* is very different from that of a court of probate in considering the validity of a testamentary disposition of the same property. The two proceedings are presented in different ways upon different evidence, and according to different principles and rules of law. *Sparks Case, 63 N. J. Eq. 242; Parfitt* v. *Lawless, 2 L. R. P. 462; 41 L. J. P. 68.*

Returning now to the main controversy, I am forced to the conclusion that while Clarence was the confidential agent and adviser of his mother, not enough appears in the case to cast upon him the burden of proving that there was no undue influence exerted by him. I understand the cases to hold that mere opportunity to exert undue influence, coupled with an intention to do so, is not sufficient where it appears that the testatrix is of ordinary and usual mental capacity, and this even though her mental powers may be weakened by old age or by disease. There must be some positive evidence that somebody has actively exerted influence of an undue character and extent which has had some effect upon the mind of the testatrix. In *Dumont* v. *Dumont, 46 N. J. Eq. 223,* it was said that "the party alleging undue influence must prove it, either directly or by establishing such circumstances as will warrant a presumption against the instrument which, in the absence of affirmative evidence, showing that the paper was a spontaneous act of the testator, must control as a conclusion of fact."

It is probably true that the mind of the testatrix was weakened, that her memory was not normal, and that her mental operations were rendered less efficient by her physical condition; yet I am convinced that she knew what property she had, and that she fully appreciated who were the natural objects of her bounty, and that she was able to consider and decide just what disposition of her property she desired to make.

My conclusion, therefore, is that the decree of the orphans court should be reversed, and the probate of the will be sustained.

So far as the question of the cross-appeal is concerned, I am inclined to affirm the judgment of the court below, and to add to the amount adjudged to the parties and their counsel a suffi-

cient amount to compensate them for their services in this court on the appeal, together with the necessary expenses, and I will so advise. I will fix the amount at the time of the settlement of the decree.