In the matter of the estate of CAROLINE NEUMAN, deceased.

[Argued February 10th, 1943.   Decided June 24th, 1943.]

*Mr. William D. Danberry* (*Mr. Russell Fleming,* of counsel), for the appellants.

*Mr. John P. Romer,* for the respondent.

The opinion of the court was delivered by

BROGAN, CHIEF-JUSTICE.

This appeal presents the question of whether the will of the testatrix, Caroline Neuman, was the result of undue influence. The Orphans Court of Somerset County, after a contest on this issue, determined that the will was the result of undue influence exercised over the testatrix by her sister, Mrs. Sachs, and the surrogate's order admitting the will to

probate was annulled. The learned judge, in an oral deliverance, dwelt upon several component elements in the case that he considered were established by the evidence and upon which his ultimate conclusion necessarily rested. These premises, if proved, supported his conclusions; but we cannot perceive that they were proved. For instance, the court found that the testatrix and her husband, Louis, lived in domestic harmony, "without discord and under such circumstances as to indicate that they had mutual trust and confidence in one another." We find no testimony that persuades us that such was their domestic situation. A calm evaluation of the testimony and one of the letter exhibits leads us to a conclusion quite the opposite. The testatrix and her husband, hardworking neighborhood store-keepers, had been married for twenty-eight years. For twenty years preceding the wife's death they worked together, engaged in the bakery business, he as a baker, his wife as the operator of the store and managing the business transactions incident thereto. By industry and frugality they acquired three parcels of real estate, which they held as tenants by the entirety. The wife collected the rents and the moneys arising from the bakery business. All proceeds were deposited in the bank account of the husband in which the wife had no interest. So much for the business relationship between the husband and the testatrix. There were no children of the marriage. The husband, Louis, who had been married before, had a foster son, Ignatz, now about thirty-nine years old. The status of Ignatz is not defined. Louis Neuman testified he was not his son by his previous marriage nor had he adopted him at any time but that nonetheless he regarded him as a son "and I will give him my name." Ignatz did not testify in the case.

By the will Mrs. Neuman bestowed her entire estate, both real and personal, on her mother for life, and the remainder in fee to her nephew, Allen, son of her sister, Pauline Sachs.

At the time the will was executed Mrs. Neuman was a patient in St. Peter's Hospital in New Brunswick, New Jersey. The will was signed on April 11th, 1941. She had entered the hospital on April 3d, and had undergone a serious operation on April 5th. The judge also found as an element

for his conclusion that shortly after her admission to the hospital Mrs. Neuman manifested a changed attitude (towards her husband) "a pronounced shifting of affection." This change in attitude was attributed to the influence of her sister, Mrs. Sachs. The influence was found to be "undue" and the will was denied probate. We find no proof to support this finding although a suspicion to that effect may be justified. But suspicions are not proofs and should not be elevated to the status of legitimate inferences or facts. An appeal to the Prerogative Court resulted in an affirmance of the decree of the Somerset Orphans Court.

This court has had occasion from time to time to consider the question of undue influence and from these adjudications it is clear that an influence, if it is to be considered as undue, must be such that it has resulted in destroying the free agency of a testator in regard to the disposition of his property. The coercion exerted may be mental, moral or physical, or all three, but it must be such as to pre-empt the testator from following the dictates of his own mind and will and accepting instead the domination and influence of another. No exclusive formulary may be prescribed that will serve as a standard or norm to ascertain the presence or absence of what the law denominates undue influence in any given case. But each case must be decided according to the attending facts and circumstances. In one instance, if a testator was enfeebled by age and disease slender proof of influence exerted by one holding a relationship of trust and confidence could justify the conclusion that it was undue, while in another instance, like evidence would be wholly inadequate if the testator was a vigorous and strong-willed person. (*Cf. Johnson's Case, 80 N. J. Eq. 525; 85 Atl. Rep. 254; Buckman's Case, 80 N. J. Eq. 556; 85 Atl. Rep. 240; Clifton* v. *Clifton, 47 N. J. Eq. 227; 21 Atl. Rep. 333; In re Tunison's Will, 83 N. J. Eq. 277; 90 Atl. Rep. 695; In re Strang, 109 N. J. Eq. 523; 158 Atl. Rep. 489; Wheeler* v. *Whipple, 44 N. J. Eq. 141; 14 Atl. Rep. 275; affirmed, 45 N. J. Eq. 367; 19 Atl. Rep. 621.*)

The burden of proving undue influence rests on him who alleges it. *In re Strang's Will, supra.* Such burden does

not shift merely because of the existence of a confidential relationship, without more, as in the matter of gifts *inter vivos*. There must be, in the case of wills, some other facts in proof besides a confidential relationship between testator and beneficiary. For example, that the testator's mentality was so enfeebled that it could not well resist improper influence; or solicitude and action on the part of the dominant mind to see that the will was prepared and executed; or the selection of a person to prepare it; arrangement for the presence of particular testamentary witnesses or some such self-serving and suspicious element. (Compare *Wheeler* v. *Whipple, supra,* and *In re Cooper's Will, 75 N. J. Eq. 177; 71 Atl. Rep. 676; affirmed, sub nom. Harrison* v. *Axtell, 76 N. J. Eq. 614; 75 Atl. Rep. 1100.*) Nor are the cases, *In re Colton, 11 N. J. Mis. R. 410; affirmed, 115 N. J. Eq. 327,* or *In re Smalley, 124 N. J. Eq. 461; affirmed, 126 N. J. Eq. 217,* to the contrary. Mrs. Sachs was not the dominant personality in the situation before us. The testatrix in this case, fifty-seven years of age, was not a person likely to be either coerced, intimidated or cajoled. A reading of the record rather compels the notion that she was a determined, strong-willed woman who knew exactly what she wanted to accomplish and acted accordingly. Her mentality was unimpaired. No witness suggests anything to the contrary. She had no children of her own and her concern about her aged mother was not only praiseworthy but most natural. The record is replete with testimony of the concern Mrs. Neuman had for her mother's welfare. She could not adequately provide for her out of her personal estate which amounted to about $400. Besides her mother and her husband her next of kin were two brothers and three sisters. Only the husband challenged the will, charging the undue influence of Mrs. Sachs. None of the brothers or sisters had any particular claim to the bounty of the testatrix and if she had a preference for the child of one of them—and there is evidence that she had—she was at perfect liberty to benefit him as remainderman, at the end of her mother's life estate.

The testimony of the several witnesses on the facts and circumstances surrounding the making of the will and the

occurrences at the hospital and after the testatrix was removed to her home is important and a rather detailed appraisal of them, unavoidable.

William D. Danberry, a reputable member of the bar of this state, drew the will in question. He testified that he had never met the testatrix until he was called to St. Peter's Hospital on April 11th, 1941, and asked by her to draw the will. The testatrix told him "what she wanted, how she wanted to leave her property, and what her property consisted of as she knew it and understood it, and I drew the will there in the hospital." Further, "I read the will to her and we talked. She was satisfied with it and said it was what she wanted." The will, properly executed, was witnessed by Mr. Danberry and a Mrs. Manry, employed at the hospital as assistant to the superintendent. No one except the testatrix and the two witnesses was present. On cross-examination it appeared that Mr. Danberry had come to the hospital in response to a telephone call to his home from Mrs. Manry, received between 11 and 12 o'clock in the morning on the day (Good Friday) on which the will was drawn. He inquired of Mrs. Manry whether the person was seriously ill, and receiving an affirmative answer, went directly to the hospital and attended Mrs. Neuman. The testatrix informed him that she was worried about the well-being of her mother, who was aged, and that she wanted her mother "to have everything that she [testatrix] had for life and she wanted anything that was left to go to her nephew, Allen." Upon learning that her personal estate amounted to very little and being informed that the title to certain real estate was in the name of the testatrix and her husband as tenants by the entirety, Mr. Danberry informed the testatrix that the will "would not control her real estate," whereupon the testatrix advised him that "she hoped to be able to persuade her husband to divide the real estate so that he could have his share of it and she could have her half of it to do with as they each individually pleased" and that she would have her lawyer, Mr. Randolph (who was out of town on the day in question) attend to that matter. The execution of the will was in no way challenged.

Amelia C. Manry testified that on April 11th, 1941, Mrs. Sachs, a sister of the decedent and the mother of Allen, came to the hospital office and asked her if she would draw a will. Mrs. Manry declined but mentioned the name of several lawyers, whereupon Mrs. Sachs asked her to telephone one of them as Mrs. Neuman wished to make her will. Mrs. Manry called Mr. Danberry.

Pauline Sachs, the named executrix, was then called. She testified that she and her deceased sister had been very intimate and that her sister discussed her business affairs with her; that Mrs. Neuman asked her to call her lawyer, Asa F. Randolph. She did so and learned Mr. Randolph was away on vacation. The witness was then directed by her sister to "locate some lawyer." Mrs. Sachs thereupon called upon Mrs. Manry. Mrs. Sachs then went to lunch and remained away until after two o'clock in the afternoon. In the interval the will had been prepared and executed. Upon her return the testatrix told her she had seen Mr. Danberry and that everything had been taken care of. The witness said she didn't discuss the terms of the will with the testatrix and denied knowing what it contained. She stated that on the following day, April 12th, she sent a telegram to Mr. Randolph, dictated by the testatrix. The telegram was sent from her home in New York, in Mrs. Neuman's name. Mrs. Sachs testified that she added thereto "per P. S." (her own initials), but on the telegram, which was offered in evidence, no such addendum appears. The telegram advised that Mrs. Neuman had spoken to her husband about having "deeds changed" so that each would have half of the real property and that the testatrix thereby would be "able to provide for my old mother who is penniless and will not be provided for by Mr. Neuman;" the telegram urged that Mr. Randolph "do all in your [his] power to fulfill my wish."

Mrs. Sachs, after her sister's death, which occurred on June 14th, 1941, learned from Mr. Danberry, who had retained custody of the will at the direction of the testatrix, that she was the executrix named. The testatrix had told her in case of her death, to communicate with Mr. Danberry. She disclaimed prior knowledge that she had been named as

executrix. She further testified that she had no knowledge whether Mrs. Neuman got a reply from Mr. Randolph to the telegram of April 12th, and denied that she got into communication with Mr. Randolph or saw him between the time the telegram was sent and the time her sister died. In this she was supported by Mr. Randolph's testimony. She also denied that she had any knowledge that there had been any conveyance of the real estate owned by Mr. and Mrs. Neuman which changed the quality of the title. She further said that it was not until ten days after her sister's death that she learned the contents of the will; that the testatrix was godmother of Allen, her nephew. She denied any knowledge that testatrix intended to favor Allen in her will. She admitted that she knew that if title to the properties owned by Mr. and Mrs. Neuman as tenants by the entirety remained unaltered that the testatrix would have no power of disposition of such real estate by will, but insisted that she did not find out anything about change in title to these properties until ten days after the death of her sister. Cross-examined about the telegram, she admitted that she knew her sister contemplated having the deeds to the real estate changed so that the title held would be transformed into a tenancy in common. Here the witness fell into an inconsistency, if not a contradiction because she had previously testified that she had no such knowledge until after Mrs. Neuman's death. There were other inconsistencies in her testimony—if not contradictions. She was under the pressure of cross-examination by counsel and under interrogation by the court on the matter of what she knew about the title and what she suggested or urged about the real estate, if anything, in view of the ultimate interest of her son, Allen. The title question was certainly a technical matter to her—a woman of little education—and that she was alive to the fact that she was charged with exercising undue influence upon her sister and that her every act was suspiciously regarded, was manifest. The witness was agitated, confused, and, as we think the record discloses, at times very nervous. But, however all this may be, the witness was completely frank in stating that she was on terms of the closest intimacy and confidence with her sister.

This relationship was quite natural. Mrs. Neuman had a perfect right to confide in her younger sister if it pleased her to do so, or in a stranger to the family for that matter. We think, in our appraisal of the evidence, that Mrs. Sachs knew perfectly well the intentions of the testatrix with regard to the title to the real estate and was the confidante of her sister in her plan to acquire the right to dispose of half of the property. She was evasive in her testimony and not helpful to the court, fearful that her knowledge would inculpate her. But there isn't a scintilla of evidence that she persuaded the testatrix or unduly influenced her in the matter of the will or the change of the character of the title to the real property.

Mr. Randolph, the decedent's family lawyer, stated that he had represented testatrix for a number of years in real estate matters and that he prepared the papers by which title in Mr. and Mrs. Neuman as tenants by the entirety was changed to title in them as tenants in common and that before the deeds were executed he explained to them precisely what would be accomplished thereby; that after that was done he advised Mrs. Neuman to make a will but that she made no answer and there was no further discussion about the matter. He was unaware that she had made a will until after her death. He stated that at no time had he seen Mrs. Sachs; that on the day the will was drawn he had left for a vacation and did not return to his office for more than two weeks thereafter at which time the telegram, mentioned above, was called to his attention. He expressed the opinion that the telegram in question might have represented the manner in which Mrs. Neuman expressed herself and said further that prior to the date on which the deeds were drawn, May 16th, 1941, he had discussed with the testatrix the legal effect of tenancy by the entirety as against tenancy in common; that in fact he explained the effect of a tenancy by the entirety to Mr. and Mrs. Neuman, when they purchased two of the properties some time before; Mr. Neuman, he said, spoke quite brokenly and he made sure that Mr. Neuman understood exactly what the deeds were and the effect of their execution and the witness stated unequivocally that Mr. Neuman stated at the time that he did understand.

The next witness, Eleanor Wagner, a niece of the decedent, worked in the bakery for about five and a half years. She stated that the relationship between Mr. and Mrs. Neuman was not strained; denied that Mrs. Sachs was a frequent visitor in Mrs. Neuman's home and said that during the time Mrs. Neuman was in the hospital she seemed to be irritated which the witness attributed to the fact that Mrs. Sachs had been a visitor and that when Mrs. Sachs was not present Mrs. Neuman seemed more at ease.

Antonette Habacker, one of decedent's sisters, who did not visit Mrs. Neuman when she was at the hospital "more frequently" because, as she said, she was discouraged from doing so by Mrs. Sachs.

The husband of the testatrix, Louis Neuman, as we understand his testimony, said that he asked his wife whether she had signed some paper (probably meaning the will) and she assured him that she had not and told him not to worry. He said his wife had advised him to go to see Mr. Randolph and it was there that he learned about the telegram, mentioned above; that he didn't discuss the telegram with his wife. He further said that after Mrs. Sachs left the house subsequent to his wife's death there was a "tax paper" missing concerning the real estate which the testatrix previously kept in the safe. He also said that on one occasion when Mrs. Sachs and the testatrix and he were together, after testatrix had come home from the hospital, Mrs. Sachs had remarked that Mr. Neuman had not signed "that paper." The witness probably meant a deed or deeds. This was categorically denied by Mrs. Sachs. The witness said that he replied he would sign anything. He further said he didn't know his wife had made her will when he signed these deeds. Previously she had denied making a will. He admitted that Mr. Randolph explained the transfer of the real estate but "I did not listen." He said that he knew if he died first "his wife would get everything" but that he did not grasp the facts that Mr. Randolph explained. He had been asked by Mrs. Neuman on many occasions to sign deeds to change the character of their title and finally said that he agreed to do so for the sake of "peace." In fact he called at Mr. Randolph's office

and asked him to call at the Neuman home for this very purpose. At this juncture it should be observed that the testimony of this witness that he "did not listen" to the explanation of Mr. Randolph and that he did not understand the change to be effected in the title when the deeds were executed is far from impressive.

The mother of the decedent, Anna Pobarsky, testified that Mr. and Mrs. Neuman did not get along well; that they constantly had difficulties.

A letter was received in evidence when Mrs. Sachs was recalled to the stand. The witness said she received it from the testatrix. The letter was undated but its envelope carried a post-mark of May 16th, 1941. It was in the handwriting of the testatrix. The purpose of the letter was to show that the testatrix and her husband were not congenial in their married life. In this letter testatrix refers to her husband as "dirt." Towards the conclusion of the letter there is this sentence: "But I will vent my spite on him for those things he did to me during the past years * * * My * * * [husband] looks like a bandit. He wants everything that he pleases * * *." This letter apparently was written more than a month after the will was made. The testatrix, in the letter, exhibited exultation over the fact that she had made her will and had kept that fact from her husband and that she had arranged for the family lawyer to visit them and rejoiced over having her own separate estate after the title to the real property had been rearranged.

Mr. Danberry, recalled to the stand, reiterated his statement that at the time he prepared the will for Mrs. Neuman he advised her that the real estate could not be disposed of by will if the husband survived her, to which she replied she would endeavor to persuade her husband to "divide the property" and that after her years of work in the bakery she should have an equal share of the real estate. He also said Mrs. Neuman told him on that occasion that "she and her husband were not getting along very well;" that there was "not much affection between them" and that the moneys from the bakery went into Mr. Neuman's bank account; that she was chiefly concerned about her mother who was old and that she didn't

wish her to be a charge on any of her sisters who had their own families to look out for; that Mrs. Neuman did not request that he communicate with Mr. Randolph but she said she would do so herself; that the testatrix spoke about having the title to the real estate changed without any suggestion from him and that at no time between the date of the execution of the will and the probate did he inform anyone about the contents of the will.

This is all the pertinent testimony. From it the contestant urges that undue influence was proved and rests that argument upon several propositions: First—"The appellant hired a lawyer who drafted the will." There is no substance to this point. The fact is quite different. Mrs. Manry, a disinterested hospital employee, selected Mr. Danberry to draw the will in the absence of Mr. Randolph, the regular attorney of the testatrix. She testified that Mrs. Sachs "left it to me to call someone." Mrs. Sachs did not know Mr. Danberry and never was in communication with him until after her sister's death. Second, "the appellant tried to exclude Mrs. Habacker from decedent's presence." Mrs. Habacker was a sister of the decedent and a review of her testimony persuades us that her conclusion that "she wasn't wanted at the hospital" is not well founded. Mrs. Habacker, in her testimony, exhibited some spleen and disappointment about the provision of the will. She has three daughters and evidently considered them worthy of the testatrix' benefactions.

It is next said that the much discussed telegram sent by Mrs. Sachs to Mr. Randolph was proof of undue influence. We cannot find that this is so. It seems to have been proven beyond dispute that the testatrix was determined that she should have what she considered her just share of the real property and she instructed her sister to send the telegram in question to her regular attorney. Clearly it was not as convenient for her to attend to it.

It is further said that the decedent's "denial of execution of any papers" was indicative of undue influence. We do not find this to be so. What is meant is that the testatrix, according to the testimony of her husband, Louis, denied having made a will. She was under no duty to tell him that

she had, and from the domestic situation of this husband and wife, as we discern it, it is probable that had Mrs. Neuman told her husband that she had made a will, she anticipated her difficulty in obtaining a change in the title would be increased.

It is also argued that the silence of the testatrix respecting the will indicated undue influence. But this is not so. Her will was her own personal affair. It is not customary to discuss the provisions of one's will or to advise even relatives what disposition had been made of one's property. And, finally, it is said the will was unnatural. We are unable to perceive that it is. The testatrix provided for her mother as long as the mother should live and gave the remainder to a nephew whom she favored. This she was free to do. Nothing in our law ordains that a testator make disposition of his estate according to any formula or standard. We visualize Mrs. Neuman, from the evidence in this case, as a hard-working, thrifty, strong-minded woman. She was not the type to be influenced by anyone. So far as the record shows the nephew, Allen, was her only nephew. What Mrs. Neuman had to dispose of by will was her own to do with as she chose and as long as the will was her very own—and we find it to have been—and not that dictated by the influence of another —and we find that it was not—it must stand. There was nothing in the case to indicate any infirmity of mind in the testatrix. There was no evidence at all of vacillation, of any change of testamentary intent, any inconsistency between the will she made and anything she had previously or subsequently said. In a word, evidence that the will under consideration was the product of undue influence is simply not in the case.

The decree under review should be reversed, and the will admitted to probate.

*For affirmance*—PARKER, CASE, JJ. 2.

*For reversal*—THE CHIEF-JUSTICE, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, DEAR, WELLS, RAFFERTY, HAGUE, THOMPSON, JJ. 12.