# CASES

ADJUDGED IN

# THE PREROGATIVE COURT

## OF THE STATE OF NEW-JERSEY.

## APRIL TERM, 1831.

---

## PATTY DAY v. WILLIAM DAY.

In ordinary cases, where a testator is in health and of ability, it is not neces-
sary to show that the will was read over to him, or that he knew the con-
tents of it. The legal presumption in such cases is always in favor of the
will; and he who seeks to impeach it must show conclusively that the tes-
tator was imposed on, or that there was some mistake whereby he was de-
ceived.

But where it appears affirmatively that the testator did not read the will him-
self, and that it was not read to him, it must then be shown to the satisfac-
tion of the court that he was in some other way made acquainted with the
contents of the instrument and approved them.

So if the testator be incapable of reading the will, whether the incapacity
arise from blindness, sickness, or any other cause, the rule is the same, and
the burden of proof is thrown on the person offering the will.

If it be established either by direct evidence, or by circumstances so conclusive
as to admit of no reasonable doubt, that the will in question was truly copi-
ed from a previous will, with the contents of which the testator was ac-
quainted, the instrument will be admitted to probate although it was nei-
ther read by him nor in his hearing.

Or if it can be shown that the will in question is substantially in accordance
with the instructions of the testator, it may be considered as sufficient evi-
dence that he was acquainted with its contents.

If a prior will be revoked by a subsequent one, and both be improperly de-stroyed, the contents of the first instrument cannot be established as the tes-tator's will, although the contents of the second will cannot be ascertained.

It is usual to allow the costs of both parties incurred in contesting a will to be paid out of the personal estate, except where it appears that the conduct of one or other of the parties is frivolous, oppressive or fraudulent.

Counsel fees should also be allowed to the executor, who offers the will for probate, and in proper cases counsel fees may be allowed to both parties out of the estate.

ON appeal from the decree of the orphans' court of the county of Essex, refusing probate of a paper writing purporting to be the last will and testament of Amos Day.

*1. H. Williamson*, for the caveator and appellant.

*Wall*, for the executor.

THE ORDINARY. Amos Day, late of the county of Essex, died on the seventeenth of March, eighteen hundred and thirty. The paper writing which is sought to be established as his last will and testament, bears date and was executed on the third day of the same month of March. On the twenty-seventh day of March, Patty Day, the widow, filed with the surrogate a caveat against proving any instrument purporting to be the will of the deceased. The case came up in due course of law for investigation before the orphans' court. The caveator insisted, on the hearing below, that the execution of the will was not sufficiently proved to entitle it to probate; or if it was, that the evidence showed it to have been procured by fraud and misrepresentation, in which case it could not be considered as the will of the testator. And the caveator further insisted that a former will, proved to have been drawn by Dr. James R. Camp, and which had been, as was alleged, improperly destroyed by the respondent, should be admitted to probate as the last will of the deceased. The executor, on the other hand, contended that the will was sufficiently proved, and that the charge of fraud and misrepresentation was wholly unsupported.

[Day v. Day.]

'The court, after hearing the evidence and arguments of counsel, adjudged that the caveat was supported, and that the will was not entitled to probate ; and they further adjudged that " the former will made and published by the said Amos Day, deceased, and drawn by James R. Camp, the contents of which appear in the testimony of said James R. Camp, is not entitled to probate," and that the application for that purpose be refused. They also adjudged that all the evidence taken of the declarations of Amos Day, on the subject of the disposition of his property, made previous to the execution of his first will, drawn by James R. Camp, be overruled, except the evidence of the instructions given by the deceased for drawing the will. And the court further ordered, that the costs of the suit on both sides, including counsel fees, be paid out of the personal estate

Both parties have appealed : the executor from that part of the decree which refuses probate to the will offered by him, and the widow from that part which refuses probate to the will called the Camp will, and also from those parts that overrule certain testimony and award the executor costs and counsel fees, to be paid out of the estate.

The first question which I shall consider in the investigation of this case is, whether the factum of the will offered by the executor is sufficiently made out.

It is admitted on both sides, that the formal execution of the instrument, so far as regards the signing and publication, is substantially proved. The testator affixed his name in the presence of all the witnesses, and acknowledged the instrument to be his last will and testament. The difficulty grows out of the question whether it is sufficiently manifested that the testator understood the contents of the instrument he was signing. In ordinary cases, when a testator is in health and of ability, it is not necessary to show that the will was read over to him, or that he knew the contents of it. The legal presumption in such cases is always in favor of the will; and he who seeks to impeach it, must show conclusively that the testator was imposed on, or that there was some mistake, whereby he was deceived.

[Day v. Day.]

In this case it is without question that the testator did not read the will himself. It was not in his possession so as to afford him an opportunity; and if it had been, he was so weak and low as to be unable to do it. It is also clear, that it was not read over to him. It must then be shown to the satisfaction of the court, that he was in some *other* way made acquainted with the contents of the instrument, and approved them. In this case the presumption of law fails; and it becomes the duty of the person offering the will, to show that the contents of the paper were fully made known to the testator. So if the testator is incapable of reading the will, whether the incapacity arise from blindness, sickness, or any other cause, the rule is the same, and the burden of proof is thrown on the person offering the will: 1 *Swin.* 96; 4 *Burns' Ec. Law*, 56. And in the case of *Billinghurst* v. *Vickers*, 1 *Phill. Ec. Rep.* 187, it was held, that when the capacity to read is doubtful, it must be shown that the will was read over, or that it conforms to the instructions given.

It appears by the testimony, that in the summer of eighteen hundred and twenty-nine, the testator procured Dr. Camp to draw his will. Some time after it was executed, he was desirous of making an alteration in the disposition of his property, and had another will drawn by Dr. Camp, in which he gave to his daughter Mary the sum of three thousand dollars, instead of two thousand dollars, as given in the first will. During his last illness, being still dissatisfied with the provisions of his will, especially as they related to his daughter, he sent for his son William, in whom he appears to have placed unbounded confidence, and communicated to him his intention of altering his will. William drew a new will from the Camp will, taking that as the basis, and making such alterations as the testator directed. He was employed in this duty for a number of hours, by the bedside of the testator. Being desirous of consummating the business, the testator inquired of William whether the will was almost ready to be signed. William said it was almost ready; that he had written one copy almost through, and had made a mistake in three or four, or four or five lines, and in consequence of the

[Day v. Day.]

mistake he had commenced another copy, and had got it almost done, and that it would be ready in a few minutes. He was at that time copying from the Camp will. There was also another paper on the table at the same time, which the witness who testifies to these facts supposed to be the one in which the mistake was made. After the drawing of the will was finished, it was discovered that there was not room on the paper for the signature of the testator and witnesses. It was suggested by some one that it would answer to attach to it another piece of paper with wafers, on which the testator and witnesses might sign, and it was done so. The will was then executed and sealed up, and was, together with the Camp will, given by William to Mrs. Day, who locked them up in the secretary or drawer. The next evening William came over with another paper which he had prepared. He told the testator, in the presence of some of the witnesses, that the will which had been executed the evening before had a piece of paper sealed to it for the signatures; but he thought it would not look well, and he had therefore drawn another one, which was an exact copy from the one already executed. To this observation the testator said nothing. One of the subscribing witnesses says, that William asked the testator if he should read the will, and another one thinks that such inquiry was made of him; both unite in saying that the testator still remained silent. The other witness heard nothing on the subject of reading the will, though present in the room. William then asked testator if he would sign the will. Testator spoke and said, If I do, it must be quickly. He was then bolstered up in bed, and the will was signed. The will of the night before, and also the Camp will, were then put on the fire by William and destroyed.

It is plain, from the history of the transaction, that the testator did not acquire any knowledge of the contents of the paper from reading it or hearing it read. He must have reposed himself implicitly upon the assurance of William, that it was a true copy of the will executed the night before. I think it right to infer, that that will was correctly drawn, according to the in-

tention and direction of the testator. It was done in his presence, and not in haste; and I see nothing to lead to the suspicion that any deception or misrepresentation were made use of by William toward his father. If, then, the fact can be established that this last will was truly copied from the one executed the night before, there can be no difficulty in admitting it to probate. This fact may be made out either by direct evidence, or by circumstances so conclusive as to admit of no reasonable doubt.

As to direct evidence, there is none. No witness has testified that this paper is a copy of the one executed the preceding evening. No person has proved the contents of the first will drawn by William, so as to compare them with the will now offered for probate, and thus ascertain whether they are the same or not. On the other hand, it is perfectly clear that it could not have been copied from the paper executed on the preceding night. That was given to Mrs. Day, and was locked up with the Camp will in the drawer; and it remained there, as we have every reason to believe, until after the last will was executed.

It is contended, however, that there is evidence to show that William, when he drew the first will, made two copies; that in one of the copies he had made some mistakes, and consequently drew a second one, and therefore that he was enabled from this first draft to prepare an accurate copy on a paper sufficiently large to admit of the signatures of the testator and witnesses.

The facts as I understand them are these, according to the testimony of John C. Mooney and Timothy Burnet, jun. William, in preparing the first draft, made a mistake in three or four, or four or five lines; he had written some parts twice over; he had got the copy almost ready for the testator to sign it, but in consequence of the mistake he had commenced another copy. This is what William told his father at the time the first will was executed. But that this draft was in conformity with the will, actually first prepared and executed; that it was preserved by William and taken home with him; and that the second will he prepared is a copy of it, are matters which rest only in supposition. No one saw this rough draft after the execution of the

first will; no one saw him write the second will; and no one appears to have known the contents of it, until it was opened after the testator's death. It would be entirely unsafe for the court to rest upon such evidence.

If, however, this will can be shown to be substantially in accordance with the instructions of the testator, it may be considered as sufficient evidence of the fact in question.

Here, too, we are met with difficulties. There is no person to testify what those instructions were; no one heard the conversation between the testator and William, while the first will was preparing. There is evidence, however, to show, that the testator wanted to have his will altered. We have his previously declared intentions on the subject, showing in what particulars he designed the alterations to be made. If these previously declared intentions are to be considered as evidence of the instructions given to William—and I know of no other—then I have no hesitation in saying that the will does not conform to the instructions given.

The testator had one daughter, the issue of his third marriage. She was the child of his old age, and of tender years. He thought her to be an uncommonly smart child, and doating on her, as was natural, he appeared determined to give her a good education, and to make an ample provision for her in the disposition of his estate. In the first will drawn by Dr. Camp, he had given her an absolute legacy of two thousand dollars, the interest to be paid to her annually until she arrived at age, and then the principal. Fearing, however, that he had not done enough for her, he shortly after procured Camp to draw him a second will, in which he gave Mary three thousand dollars instead of two thousand. Just before his death, he expressed himself dissatisfied with this will, and the ground of his dissatisfaction was that he had not done enough for Mary. William is called in to alter the will, and it is done. Under the present will, Mary receives no money at all, nor is there any provision made for her education or maintenance. She gets nothing until the marriage or death of her mother, at which time she is to have

[Day v. Day.]

what is called the homestead property, valued at three thousand dollars, with a limitation over to the other branches of the testator's family in case she should die under age. Nothing is given to Mrs. Day for the education of this favorite daughter. The provision made for the widow under this will, is substantially the same as under the Camp will.

The difference, as it regards Mary, in the two wills is this. By the Camp will she was to receive during her minority the interest of three thousand dollars, or one hundred and eighty dollars per annum, and the principal when she came of age; and this was absolute. At the same time her mother was provided for. By this last will, she is altogether dependent on her mother until the marriage or death of her mother; while at the same time the mother is no better provided for than she was under the Camp will; and at the mother's marriage or death, Mary receives the homestead house and lot, with the furniture, valued at about three thousand dollars, subject to the limitation over, as already stated. Surely this cannot be considered as an alteration advantageous to Mary. She must needs be deprived, in a great degree, of the advantages of education, and especially of such an education as her father intended she should receive. The scanty income arising from her mother's property, will not afford it.

There is some evidence to show that the testator was desirous of giving to Mary land instead of money; that he considered it more safe, and was desirous of securing her property in such way that it would not be lost to her by the negligence or dishonesty of his executor. But there is nothing to show that in making such change he intended to give her less in land than he had given her in money. His avowed object was to give her more. It is evident, however, that the provision under the last will is much less valuable than that under the first.

There are some other circumstances that might be adduced to show that this will does not conform to the instructions given, so far as those instructions are to be gathered from the previously declared intentions of the testator; but I deem it unnecessary to

[Day v. Day.]

notice them in detail. They are not very important in themselves, separately considered ; when taken together they are deserving of some weight.

Without going into the question of fraud, which was discussed at the bar, I am willing to say that the factum of the will is not made out, and therefore that the orphans' court did right in not admitting it to probate.

2. The second point to be considered is, whether the will drawn by Dr. Camp, and the contents of which it is contended are sufficiently proved by him, shall be established.

There are cases in which the contents of a will may be proved and may take effect, although the will itself is destroyed ; but this is not one of those cases. Here was a will actually and regularly made and executed by the testator, subsequent to the Camp will. This was a perfect revocation of the Camp will : *Swin. 525* ; and it was intended to be so by the testator. There is no evidence that he ever intended to restore it. If the contents of any of the former wills could be admitted to probate, it must be of the first will drawn by William. It does not follow, that because the contents of that will cannot be ascertained and established, therefore the contents of some prior will shall be established. Admitting that the Camp will was improperly destroyed by William, the other will was destroyed at the same time, and in the same improper manner ; and no argument *in odium spoliatoris*, can be drawn in favor of the Camp will, that does not apply more strongly to the other.

3. The only remaining inquiry is as to the costs.

The orphans' court ordered the costs of both parties to be paid out of the personal estate. This is the usual course of the court, except when it appears that the conduct of one or other of the parties is frivolous, oppressive or fraudulent. It is the duty of executors to present wills for probate, and if disputed, to have their validity tried in the mode prescribed by the law. If they fail in the attempt, the general rule is to allow them their costs out of the estate. It would be unjust that they should suffer loss in the honest discharge of their duty.

In this case, it is said, the executor, to whom costs were given, was the drawer of the will, and interested in it; that he took advantage of the confidence placed in him by the testator, and fraudulently imposed upon him. If the orphans' court had thought proper to place itself on the ground of fraud in the procurement of this instrument, it would have been wrong to award costs to the executor; but there is no evidence of that being the case; and this court being of opinion that the factum of the will is not sufficiently proved, and not knowing but the court below took the same view of the subject, is not prepared to say they erred.

Looking at the case as it is presented on the question of fraud, I am willing to admit there are suspicious circumstances, unexplained, from which fraud may be presumed; yet I am not prepared to say that they are of such a character as to induce the court to say, on a question of costs, that the will was fraudulently procured, especially when the cause has been decided on another and more satisfactory ground.

I am satisfied, then, to affirm this part of the decree, unless it is made to appear that the costs and expenses allowed were illegal and unreasonable. In this case counsel fees were allowed, and it was said at the bar that such allowance was unlawful and without precedent. I have not so understood the law or the practice. As it regards the executor, it is surely right that he should be reimbursed his reasonable expenses. It is uniformly allowed when matters of account are litigated before the orphans' court; and I think, upon the same principle, it should be allowed where, in the discharge of his duty, he undertakes to prove a will. Generally speaking, counsel are necessary in both cases.

In the case of *Liddel* v. *McVicker*, the orphans' court of Morris allowed Mr. McVicker, as administrator, the counsel fees paid by him in litigating his account before that court. The case went up to the supreme court by certiorari, and this allowance was assigned as one of the grounds for reversal; but the court said they saw no sufficient objection to the item: 6 *Hals.* 44.

[Day v. Day.]

In the case of *Dufford's will,* decided some few years back, the orphans' court were equally divided on an application for probate. The cause came up into this court, and probate was refused by the ordinary, (Williamson,) on the ground of the testator's incapacity. The costs in that case, including counsel fees on both sides, were paid out of the estate.

There is one other ground of appeal, which relates to the overruling of evidence; but the view taken by the court renders it unnecessary to give any opinion on that point.

The result is, that the decree of the orphans' court is in all things affirmed. Amos Day must be considered as having died intestate, and letters of administration issue accordingly.