## Essex County Orphans Court.

In the matter of a paper-writing purporting to be the last will and testament of LEILA SMITH.

[Decided April 1st, 1926.]

**Wills—Probate—Lack of Testamentary Capacity and Undue Influence Alleged—Testatrix an Invalid for Many Years, but of Sound Mind—Testimony Clearly Shows That Her Mind was Sound the Day Will was Executed—Mother of Testatrix, Natural Recipient of Her Bounty, Had Sufficient Money, as Testatrix Said—Evidence Indicated Testatrix Did Not Want Her Mother to Know of Her Act—Friends and Rector of Church the Principal Beneficiaries—Undue Influence Not Shown.**

On appeal from a decree of surrogate, admitting will to probate.

*Messrs. Hood, Lafferty & Campbell* (by *Mr. Louis Hood*), for the appellant.

*Messrs. Osborne, Cornish & Scheck* (by *Mr. Harry V. Osborne*), for the executor-respondent.

*Messrs. Riker & Riker* (by *Mr. Andrew Van Blarcom*), for Myra Germond and Dorothy Germond, legatees.

PORTER, J.

This case comes before me on appeal from a decree of the surrogate, admitting to probate a paper-writing purporting to be the last will and testament of Leila M. Smith, deceased.

The appellant's contention is that there was a lack of testamentary capacity and that undue influence was resorted to in the procurement of the will. The testimony is that testatrix, Leila M. Smith, was unmarried and lived with her widowed mother in the village of South Orange, where together they occupied a large old-fashioned house, and where

Miss Smith died on September 13th, 1925. Miss Smith was over fifty years of age, and Mrs. Smith, her mother, over eighty years of age. The other members of the household were Margaret Cunningham, a cook and house servant, and Jessie B. Browning, a practical nurse who looked after Miss Smith. John McGarry was also employed about the place as gardner and furnace man. Mr. Smith died about eight years ago. Miss Smith was an invalid for many years, and for several years before her death was practically helpless, unable to walk, write, dress or feed herself. Her vocal organs were affected so that she did not speak distinctly. Both she and her mother were, and had been for years, members of the Church of the Holy Communion of South Orange. They had not attended service there since Mr. Smith's death. The rector of that church, Rev. George A. Hanna, was in the habit of calling upon them and administering the sacrament of Holy Communion to them about four times each year.

First, as to testamentary capacity.

The testimony clearly shows that Miss Smith was very intelligent and fully competent to make a will. In fact, there is no testimony to the contrary except as to her mental condition during the last days of her life. Up until about ten days or two weeks before her death she was able to sit in a chair, as had been her habit. During the last ten days or two weeks, however, her condition became such that she was unable to be taken from her bed.

The alleged will was dated September 11th, 1925, which fell on Friday, death ensued on Sunday morning, September 13th. The attending physician, Dr. William E. Wakeley; Rev. Mr. Hanna, the nurse, Mrs. Browning; the servant, Miss Cunningham; the latter's niece, Marie Gelshiman; Mary G. Elsmore and Arthur A. Mitchell, all testified as to Miss Smith's physical condition on September 11th, the date of the alleged will. The last three named were the attesting witnesses to it. The testimony of these witnesses as to what transpired in the sick room and the conversations had between some of them and Miss Smith on that day leaves no doubt that she was possessed of her mental faculties and

was fully competent to comprehend the nature of her acts and therefore had testamentary capacity.

Against that testimony, however, is that of Mrs. Smith, who testifies that Miss Smith was only semi-conscious on Friday, the 11th, and that she had been with her practically all of that day. Dr. Wakeley's testimony is that Miss Smith had a sinking spell and was nearly in a state of coma on the preceding Tuesday or Wednesday, and was not in that condition on Friday. The clear weight of the testimony is that Miss Smith was not in the condition on Friday described by her mother. Mrs. Smith has evidently referred to her daughter's condition of coma as spoken of by the doctor, and is mistaken as to the day of its occurrence. The testimony is that the will was received by mail on the 10th and read to Miss Smith on that day. Mrs. Nicolay testifies that she called at the Smith home on Thursday, the 10th, and was there from about eleven to two o'clock, and that Miss Smith was very sick and did not speak to her. That does not necessarily disprove the fact of her having been too sick at other times that day to have understood the reading of the will.

The standard of testamentary capacity has been fixed by our courts at a very low point in the scale of intelligence. The right of a testator, however feeble his powers of mind or body, to the control of his property by testamentary disposition, so long as he has intelligence to exert it, has been inflexibly maintained. *Loveridge* v. *Brown, 3 N. J. Adv. R. 1050.* Thus, in the case of *In re Hanes' Estates, 3 N. J. Adv. R. 1651,* it was said: "Our courts guard the right of testamentary disposition jealously. They hold that this right may be exercised by a person of very moderate capacity. He must have a disposing mind and memory, but his memory may be very imperfect. He may not be able at all times to recollect names, persons or the families of those with whom he has been intimately acquainted. He may at times ask idle questions, and repeat those which have been asked and answered; he may not have sufficient strength of memory and vigor of intellect to digest all parts of a contract, and yet be competent to make a will. If he is capable of recalling of

what his property consists 'and who, either in consequence of ties of blood or friendship, should be objects of his bounty, and has a mind sufficiently sound to enable him to know and to understand what disposition he wants made of his property after his death, he may make a valid will." See, also, *Ward v. Harrison, 3 N. J. Mis. R. 470; In re Freeman's Will, 2 N. J. Mis. R. 786.*

Applying these principles to the case under consideration it must follow that Miss Smith possessed testamentary capacity at the time of the execution of the will by her.

Second, as to undue influence.

The first inquiry is as to the person or persons against whom this charge lies and the motive. The will remembers the friends and relatives of Miss Smith, the nurse, the servants and the library, and gives the residue to Rev. Mr. Hanna in trust for the use of the church. Mrs. Smith, of course, as the nearest, and, I take it, the dearest relative of Miss Smith and the natural object of her bounty. She is left only certain jewelry. However, the will gives the reason for that, saying, "My mother is already well provided for, so that I give her nothing more." From the testimony it appears that Mrs. Smith owns valuable real property, one piece in New York City, the income from which maintains her. It would seem that there was a basis for that statement in the will, and that the reason for not leaving anything of substance to Mrs. Smith was based on facts or what, at least, could have been considered fact by Miss Smith.

Miss Smith was deeply religious and very much interested in the work of the church, and especially in the Alaska mission. The nurse had been caring for Miss Smith for nearly two years. The servant for about eighteen years and the gardener for several years. The amounts bequeathed to them are not large nor unreasonable. There is some testimony that Mrs. Browning was not always kind to Miss Smith. It may be argued from that that Miss Smith would therefore not be likely to remember her in her will. But Mrs. Browning attended to the preparation of the will, as will be referred to later, and so would not likely be left out because

of that fact. The testimony of her unkindness showed nothing serious to have occurred and in itself can have but little weight. The Rev. Mr. Hanna had no knowledge of the will until after Miss Smith's death. He testified that she had never discussed the subject of a will with him. He does not personally profit by the will, and, of course, there is no evidence of any kind that he had anything whatever to do with the making of it. If there was any undue influence used it must have been resorted to by Mrs. Browning or Miss Cunningham. Both of these women appeared very intelligent and capable.

The only basis at all for charging undue influence lies in the suspicious circumstances surrounding the making and executing of the will. Miss Cunningham says that Miss Smith spoke to her about her will on three occasions, going into some details about it. All of those conversations were within a few weeks of the date of the will. Miss Browning says that she was instructed by Miss Smith a few weeks before the date of the will to find out whether a will could be made and executed without the necessity of an attorney coming to the house. She told her her mother would not approve of her making a will, and so she did not want her mother to know about it. Mrs. Browning called upon Mr. Harry N. Reeves, an attorney whom she knew, and received advice. Miss Smith, upon being informed that an attorney need not be present upon the execution of the will, instructed Miss Browning to give directions to Mr. Reeves to draw the will. She dictated to Mrs. Browning the provisions which Mrs. Browning wrote down in a memorandum book, which was preserved and put in evidence. The will was drafted by Mr. Reeves and received by registered mail on September 11th. Instructions were then given to summon witnesses. The will was read to Miss Gelshiman in the presence of and within hearing of Miss Smith. The will was then executed in accordance with the statute. Miss Cunningham testified that she was instructed to stay with Mrs. Smith in her room while the will was being executed, so that she should be kept in ignorance of it. She also testified that she was further

instructed to tell no one of the occurrence. Later on, after the death of Miss Smith, Mr. Francis Lafferty and Mrs. Nicolay called on Miss Cunningham and questioned her about the will. She then denied all knowledge of it. She explains that by saying that she acted thus because of Miss Smith's instructions. It is testified that Miss Smith said that her mother would not let her make a will. The mother denies that she would have objected—on the contrary, she says that had she known she wanted to do so she would have sent for a lawyer to attend to the matter. It is apparent from the testimony that Miss Smith had reason to think that her mother would have objected. Several witnesses, three of them old friends of Miss Smith, and one neighbor and friend of shorter acquaintance, all gave testimony that Mrs. Smith had refused to allow her daughter several things which she very much wanted to have and which she was willing and able to pay for, and all of which would have given her much pleasure. These friends tried to induce Mrs. Smith to give her consent, and only desisted in their effort when requested to do so by Miss Smith. It seems that Mrs. Smith was the dominant personality and had her own way in the conduct of her daughter. Considering the physical condition of Miss Smith for so many years, Mrs. Smith was obliged to devote her whole life to her, she cared for her constantly and did what she could for her always, except in the instances cited, so it was natural, perhaps, for her to dominate her even to the extent of thinking for her.

From all of this testimony it is clear that Miss Smith wished to keep her mother in ignorance of the will. Mrs. Nicolay was kept away from the house on the morning the will was executed, undoubtedly, in furtherance of this desire. Nor did Miss Smith inform Mrs. Nicolay of the will, although she freely talked with and consulted Mrs. Nicolay, who was her cousin, and almost daily visitor. It is true that Mrs. Nicolay testifies to a conversation with Miss Smith about a will within a few weeks of her death, in which she expressed a wish that her mother should receive her estate. I have no doubt of the truth of that testimony, and it may

well be that such was her wish at that time. For some reason, perhaps a realization of her condition, she came to a different conclusion, as evidenced - from the testimony. Surely there was a sufficient time intervening for her to have done so.

It is settled that the influence which the law denominates "undue" must be such to destroy the free agency of the testator and amount to oral or physical coercion.

It must be proved, moreover, that the act done was the result of such coercion. There must be a control exercised over the mind of the testator or an importunity practiced which he could not resist. *Loveridge* v. *Brown, 3 N. J. Adv. R. 1050.*

And in the case of *In re Young's Estate, 90 N. J. Eq. 236,* it was held that a person competent to make a will has a right to the aid of any person she may think proper to select when she desires to put her testamentary wishes in form to have legal efficiency, and if she exercises this right without improper influence or control, though she selects a person she intends to make one of her beneficiaries, that fact, in the absence of evidence, showing an abuse of confidence, constitutes no reason why probate should be denied to her will.

In this case it is obvious that no such dominating influence exists.

The impression I gained from the appearance of Miss Cunningham and Mrs. Browning on the witness-stand, together with the testimony given by them, convinces me that there was no undue influence exercised by them. Especially is this so when the provisions of the will are read. Had this will been of their making they would probably not have been satisfied with such modest sums, and would more likely, it seems to me, have made Mrs. Smith the residuary legatee rather than the church.

It follows, therefore, that the testatrix being mentally competent, and the will not being the product of undue influence, must be admitted to probate.