The surrogate of the county of Atlantic having admitted to probate the will of Amelia Craig Tobin, deceased, an appeal was taken from such order, testimony taken and the order of the surrogate was affirmed.
Upon application for fixing proctors' fees, allowance was made for proctor of contestants in the amount of $7,500, *Page 593 
and for proctors of proponents in the amount of $25,000, all to be paid out of the estate.
The conclusions of the judge of the Atlantic county orphans court are as follows:
"Atlantic County Orphans Court.
In the matter of the estate of Amelia Craig Tobin, deceased.
On appeal from probate. Conclusions.
"This is an appeal from an order of the surrogate admitting to probate a certain paper-writing as the last will and testament of Amelia Craig Tobin, deceased, the validity of which was challenged by the appellants for the following reasons:
"`* * * that illegal and fraudulent and undue influences and coercion were brought to bear on testator, at and before the making of the alleged will, and with reference to said will; and that at the time of the making, and of the supposed execution of said paper-writing, and for a long time prior thereto, the said Amelia Craig Tobin was of unsound mind, memory and understanding, and as such, incapable of disposing of her estate by will; and that the said alleged will was not properly signed, witnessed, published and declared.'
"Let us consider first, whether or not the deceased was of unsound mind, memory and understanding and, as such, incapable of disposing of her estate by will. An extended and detailed review of the testimony leads to the conclusion that testatrix was an intelligent and cultured woman.
"`Where it is shown that a testator was able to transact business with sagacity and decision his testamentary capacity will be established.' Whiteneck v. Stryker, 2 N.J. Eq. 8.
Therefore, measured by the standard set down in this case, there can be no doubt that Mrs. Tobin was possessed of testamentary capacity.
"Ascertaining secondly, whether or not the said alleged will was not properly signed, witnessed, published and declared, we reached the conclusion, from the testimony, that there was due proof of the execution of said will and as the *Page 594 
legal presumption is always in favor of the will, the evidence sustains the statutory requirements.
"Apparently, then, the only remaining ground seriously urged against the probate of the will is that of undue influence, to wit:
"`That illegal and fraudulent and undue influence and coercion were brought to bear on testator, at and before the making of the alleged will, and with reference to said will.'
"The first sentence of the above reason suggests fraud. Let us, for a moment, take up the question of fraud in the making of wills. It is well settled law, a will which is the product of fraud, or fraudulent conduct, will be denied probate.
"While undue influence embraces fraud, fraud by no means embraces every species of undue influence, since it is quite supposable that one may readily exercise a degree of influence over the testator in producing the testamentary act, which upon every just ground is fairly entitled to be considered extreme and unreasonable, either in character or degree, without its being really fraudulent. Lynch v. Clements, 24 N.J. Eq. 431 (at p.435).
"Of course, where fraud is charged the court should scan with care the relations of the testator with her beneficiary, prior to and at the time of the execution of the will, for the purpose of seeing whether they, in connection with the provisions of the will, tend to prove or disprove the charge of fraud. Accordingly, a woman competent to make a will has a right to the aid of any person she may think proper to select when she desires to put her testamentary wishes in form to have legal efficiency, and if she exercises this right without improper interference or control, though she selects a person she intends to make one of her beneficiaries, that fact, in the absence of evidence showing an abuse of confidence, constitutes no reason why probate should be denied to her will. In re Young, 90 N.J. Eq. 236;106 Atl. Rep. 425.
"The testimony is wholly barren of any fraudulent conduct and is, therefore, dismissed by this reference. *Page 595 
"Now then, was there undue influence and coercion brought to bear on testator at and before the making of the alleged will, and with reference to said will?
"There have been many authorities decided in all of the courts of New Jersey upon this question, but the best definition of undue influence this court has been able to find is that contained in the opinion of the court of errors and appeals in the case of Leveridge v. Brown, 98 N.J. Eq. 381, in which the court adopted the language of the orphans court judge, as follows:
"`The influence which the law denominates "undue" must be such as to destroy the free agency of the testator and amount to moral or physical coercion. It must be proved, moreover, that the act done was the result of such coercion. There must be a control exercised over the mind of the testator or any importunity practiced which he could not resist. Clifton v. Clifton,supra; In re Tunison's Will, 83 N.J. Eq. 277,' and
"`While the existence of confidential relations between the testator and the favorite beneficiary, standing alone, does not, necessarily, constitute undue influence, yet when such relations are supplemented by other indicia of undue influence, such as the exclusion from testator of the natural objects of his bounty, clandestinity in the execution of the will, or the active participation of the favorite legatee in procuring its execution, a presumption of undue influence may arise. Spark's Case,63 N.J. Eq. 242.'
"Some of the late cases in New Jersey which support the definition of undue influence above set forth are as follows: Inre Smith, 4 N.J. Mis. R. 353; 133 Atl. Rep. 43; In re Crotty,4 N.J. Mis. R. 745; 134 Atl. Rep. 622; In re Ashley, 102 N.J. Eq. 346; 140 Atl. Rep. 564; In re Dillon, 3 N.J. Mis. R. 784;130 Atl. Rep. 245; Ward v. Harrison. 97 N.J. Eq. 309.
"In In re Barnett, 2 N.J. Mis. R. 135, the court said:
"`It has been said that in order to shift the burden of proof to a proponent of a will, on an issue of undue influence, there must be some other elements added to proof that testator's *Page 596 
mind was enfeebled so that it was difficult to resist improper influence and the establishment of intimate confidential relationships. It is said, that slight circumstances are sufficient to be added. Among the elements which may be thus added which have been mentioned are these: (1) The initiation of proceedings for the preparation of the instrument; (2) participation in such preparation; (3) presence at the execution of the will; (4) efforts to exclude natural objects of testator's bounty from his society; (5) the concealing of the making of the will, and (6) taking possession of the will.
"`It seems unnecessary to refer to any additional authorities of law which are so firmly embedded in our jurisprudence.
"`The question of undue influence must, of necessity, be settled upon the facts of each particular case, but the general rule is that the influence which is characterized as "undue" must be such as to destroy the free agency of the testator and amount to moral or physical coercion. In other words, it must be established that the act done was the result of such coercion and the control was so potent that the control exercised over the mind of the testator was such as he could not resist.'
"After a careful analysis of the testimony concerning this question of undue influence, we come to the conclusion that Mrs. Tobin indicated that she was a woman of exceedingly shrewd intelligence, and knew just what she wanted, and was going to have it; she had a very clear idea of her assets, knew every share of stock she had; she knew what it was bringing, and what it ought to bring, and knew what she wanted to do with it, together with her other securities and property, and she was a clear-headed and astute business woman.
"The testimony further demonstrates, and clearly indicates, that in the direction of wills, Mrs. Tobin was the one that initiated the same, and it was she who directed and gave instructions as to the making thereof and in connection therewith. `In the determination of undue influence exercised upon the testator, the point of time to be considered is that *Page 597 
at which the testator executed the writing in dispute.' In reCraft, 85 N.J. Eq. 125; and during all of these interviews with her various lawyers, Mrs. Wylie was never present. During all of Mrs. Tobin's business transactions, the testimony clearly shows that she was the directing head, it was she that issued instructions as to what she wanted, again clearly indicating intelligence to a decree devoid of any exercise of coercion, or of any undue influence.
"All of the testimony introduced by the appellants consists entirely of statements made by Mrs. Tobin to these witnesses and relatives concerning Mrs. Wylie and with that exception, the case is barren of any proof or suggestion of undue influence on the part of Mrs. Wylie. I agree with counsel that Mrs. Tobin was a most noble and lovable character, yet, with all, she was in absolute control of all her faculties, was strong-willed, kind-hearted, generous, and mindful of a solemn obligation made by her, to her mother, in the taking care of Mrs. Wylie, and this loyalty, as indicated by the testimony, toward her sister, may have created a suggestion or a suspicion that Mrs. Wylie might have practiced undue influence to a degree, as defined by our law, so as to destroy free agency on the part of Mrs. Tobin. However, this is not sustained by the proofs; on the contrary, Mrs. Wylie was the one that was subservient; it was she who had to be content with what she received from Mrs. Tobin, and in the manner and fancy that was determined upon by Mrs. Tobin. Yes, Mrs. Wylie received, but only when and as given by Mrs. Tobin.
"As mentioned before, the burden of proving undue influence is upon him who asserts it. It has, however, been held that where confidential relations are shown, and any of the indicia of undue influence before mentioned, or other slight circumstances exist, that the burden of proof is shifted. It does not appear that even the slightest circumstances, above mentioned, as sufficient to shift the burden of proof exists. But assuming they do exist, and the burden of proof is shifted, and that it is the duty of Mrs. Wylie to prove affirmatively, that she did not influence the testatrix, we are met with her frank testimony, that she did not influence or attempt to influence *Page 598 
her sister, Mrs. Tobin, in the execution of her will, and that she took no interest in what disposition she made of her property, and this is sustained by the clearest and most convincing part of the testimony, and where the burden is cast upon the proponents of a will to show that undue influence has not been exerted, such burden will, as a general rule, be sustained by a general denial of undue influence, if otherwise creditable, and not challenged by other facts.
"In this case under consideration, we have that general denial from Mrs. Wylie, and the denial is entirely credible. The testimony does not establish a single instance where Mrs. Wylie attempted to impose her will upon the testatrix, in the management of her business affairs.
"The will should be admitted to probate.
 JOSEPH A. CORIO, Judge.
"Dated: February 24th, 1931. Filed: February 25th, 1931."
Upon the appeal in this court, no claim was made that the testatrix was of unsound mind, but it was claimed that undue influence had been exerted upon her by her sister, Mrs. Wylie, the chief beneficiary under the will.
A careful examination of the testimony discloses that the basis of the claim of undue influence is almost exclusively of statements and declarations of the testatrix, not made at the time of the execution of the will. A synopsis of the testimony follows:
Robert Peacock: p. 4. Only knows what Mrs. Tobin told him of rackets with Mrs. Wylie; concerning amount of money that Mrs. Wylie was getting from her estate; trouble she had had with Mrs. Wylie while she lived at Hotel Pennsylvania. Would like to have Mrs. Wylie out of her home. If she could get away from Mrs. Wylie her life would be more peaceful (wish of her mother). Mrs. Wylie had created so much disturbance there that it was through the fights she had with Mrs. Wylie that she had to take the dope. Mrs. Wylie wanted her to discharge the two nurses and the chauffeur. Had to discharge the housekeeper because Mrs. Wylie had told her *Page 599 
she was stealing. When Mrs. Tobin was in Mrs. Wylie's presence there was a change in attitude. She said she was afraid of her. Said Mrs. Wylie and Carl disrupted the peace and quietness of her household. Spent $6,497.48 on Carl and $1,206.67 on Mrs. Wylie. Mrs. Wylie and Carl beneficiaries in each of the wills. Mrs. Tobin gave me information to prepare wills. Concerning Mrs. Wylie, it was the same thing in each will. Said she and Nan had a conversation about whether she would be taken care of at her death, c., whether Nan could receive the income each week immediately after her death.
Sallie E. Serfass: p. 36. She said, "well, I am not boss in my own house." (1929). "Nan had one of her spells again and I had to get out to get some peace." She told me she got very much upset and nervous from Nan.
Florence Barrett: p. 40. Could not see her privately for past eight years. Morphine dose was minimum.
Aimee Craig: p. 51. Mrs. Tobin said she wanted to get away, that Nan was quarreling with her. Said, "you know I cannot be happy with Nan. You know what a terrible life she led me in my home in Tioga, she drove me from that home." At Tioga she said, "I cannot stay here. You know the trouble they are causing me. It will get to Nan's ears and then there will be more trouble for me." She said that she was afraid she would poison her. "All they care for is my money, and they would do anything to get it." Said she went to Texas to get away from Nan. She wanted to have peace and that was the only way she could get peace, was to separate from her. Mrs. Wylie said, "she can't make a move but what I know it." Mrs. Tobin said that Nan and Tobin couldn't get along because Tobin wouldn't let Nan boss her. Mrs. Tobin said, "well, she makes it miserable for me if I don't give her the best." "Nan said Ralph had lived with a colored woman."
Florence Craig: p. 82. She would continually complain about the quarrels she would have with her sister. Mrs. Wylie was making her life miserable. "She interferes with all my guests, people that I think a lot of." *Page 600 
 Father Gregory Moran: p. 2. I thought that she was capable of performing all the business that she came to see me about, and whatever other business was hers. I never for an instant thought she was anything but normal, that she had mental capacity. Never made a complaint against her sister.
Charles Chisholm: p. 5. Contentions were between Mrs. Tobin, herself, and Mrs. Wylie, her sister, in the form of very frequent quarrels. Mrs. Tobin told me she was very sorry to dispose of my services, and that I had officiated in my position as well as she wanted, but owing to the will and desire of Mrs. Wylie, she had to discharge me, and the rest of the servants. All servants were discharged before a reconciliation was effected after the quarrel. Mrs. Tobin did not tell me why Mrs. Wylie wanted the help dismissed. Mrs. Tobin told me she was defraying her (Mrs. Wylie's) expenses.
Alice Hailstock: p. 10. Cook from 1926 to 1928. Mrs. Tobin and Mrs. Wylie frequently had quarrels. Once it was over a month when Mrs. Wylie didn't speak to Mrs. Tobin, didn't even go in her room where she was. Mrs. Tobin said, "it's money, on account of money." Mrs. Tobin said she (Mrs. Wylie) wanted a coat and after they made up I said to Mrs. Wylie, "you have a new coat." She said, "yes, but I had a hard time getting it." I said, "is that so?"
Earl J. Gratz: p. 17. She told me then that Mr. Peacock had imposed upon her and insisted upon writing a will in which he had named himself beneficiary for a considerable amount, and it was her desire to rewrite that will. She was unquestionably mentally capable of making this will. Never heard any quarrel between Mrs. Tobin and Mrs. Wylie. She classified Mrs. Wylie and Carl as dependents, claimed exemption for them. In Florida the relationship between them was most cordial and affectionate. Just prior to her death, the only one for whom she asked at that time, and the only one she wanted to see in my presence, making the statement to me, she wanted Nan, her sister. She kept calling for her sister. She requested that she be left alone with her sister and myself. She told me she had followed my advice, she had *Page 601 
seen Mr. Yeakle and that he had prepared the will in accordance with her instructions and that she was perfectly satisfied.
Jay C. Kline: p. 49. On October 9th, 1929, she displayed to my judgment unusual strong mentality particularly keen as to the affairs of her business, and sensed the responsibility of her financial affairs, and seemed to sense that she would be more comfortable if her bank loans were relieved. Mrs. Wylie was never persent at these interviews.
Loretta Wahl, nurse: p. 53. Relations between Mrs. Tobin and Mrs. Wylie very friendly. Never quarreled. Mind clear. Gave her morphine in small doses.
Dr. Earl B. Craig: p. 58. There was an affection between the two that was so deep that really I could not describe it. It was one of the deepest things that I think I have ever known, because any time that one was ill, the other would get hold of me and say, "now, please, what's wrong; can you help her; is it serious?" I think she (Mrs. Tobin) was the keenest member of the family, not only keen as to thought, but as to conversation and mentality generally. No doubt about her ability to make this will.
Clara Flint: p. 98. Lived with Mrs. Tobin for eight years. After Mrs. Wylie came we commenced to have fusses and quarrels. They did not get along together at all. One night Mr. Carl had a gun and was going to kill himself and I went down and stayed (slept) with Mrs. Tobin all night. She said she wasn't boss of her home nor her money nor herself any more. Mrs. Wylie's habits were drinking, heavy drinking and smoking. She was very quarrelsome. Mrs. Tobin told me I would have to go because Mrs. Wylie didn't like me, and the only thing she knew for me to do was to go; if I didn't go she (Mrs. Wylie) would go. She told me that she was very fond of her husband, Mr. Serfass. I asked her why she didn't live with him and she said she couldn't on account of Mrs. Wylie. She said that Mrs. Wylie had something on her and that she couldn't do it (get rid of Mrs. Wylie) and that sometime she would tell me if I would promise I wouldn't tell anybody, but she never told me. She *Page 602 
told me she was very fond of Mr. Tobin, her last husband. Mrs. Wylie told her if Mr. Tobin stayed she wouldn't stay, so they separated. She told me that she had to change the will, that it didn't suit Mrs. Wylie. She told me on several occasions that she had to change it on account of Mrs. Wylie. Mrs. Wylie seemed to be the housekeeper and boss towards the last, but Mrs. Tobin said that she had to give in to Mrs. Wylie and let her do as she pleased in order to get along with her. She said she expected they were doing something to her, and I changed her bed for her. I asked her why she didn't have her family to come visit her more than what she did and she said she couldn't on account of Mrs. Wylie because she continually fussed with them after they went. Mrs. Tobin said that Mrs. Wylie said the money was just as much her'n as it was — just as much Mrs. Wylie's as it was her'n — she said. I heard it many a time. Mrs. Wylie didn't like me and I didn't care for her.
Cleften Burton: p. 122. Mrs. Tobin said that Mrs. Wylie was never satisfied with what she had done and it seemed as if she couldn't do anything to please her. She said, "babe, I am not boss of my money, home or myself any more." Mrs. Tobin said (referring to the gun), "yes, that is what I am afraid of. I am afraid that Carl will eventually kill himself." She wasn't afraid of the gun for herself. She said Mrs. Wylie objected. She said she was very fond of Mr. Serfass and she would dearly love to have him back, but that he wouldn't come there and live in the house with Mrs. Wylie. She said, "well, babe, what am I going to do? He won't come here with her and I daren't put her out. I just have to let her have her way to keep peace. You just don't know." To all appearances, Mrs. Tobin was boss in the house.
Ophelia Davenport: p. 136. She said (Mrs. Tobin) I have made a will several times and I would have to break them because they didn't suit my sister. Mrs. Tobin discharged the white chauffeur and hired a colored one instead, and Mrs. Wylie refused to ride in the car with the colored chauffeur, so Mrs. Tobin had to hire the white chauffeur back. Mrs. Tobin told me. *Page 603 
 Margaret M. Eckard: Companion nurse and waitress, p. 143. Mrs. Wylie not present at execution of will. Never heard Mrs. Tobin and Mrs. Wylie quarrel. Seemed to be cordial and friendly.
Carl B. Fritze: p. 151. Mrs. Wylie said, during a quarrel, "you are nothing else but a dirty rotten degenerate," and that broke up the home. (Fourth street.) She said, "here I am sending her $40 a week from Mr. Yeakle and apparently I can't satisfy her." When Mr. Yeakle asked, "why don't you throw them out?" she said, "I can't tell you."
Earl B. Craig: p. 178. She said (Mrs. Tobin), "I have been so happy since I have been down here. While I was in the east there was so much quarreling going on up there in the home that I was in with my sister Nan that I just couldn't stand it." She said, "well, I went up north to try to straighten out my affairs. I certainly found a mess. Nan had a long story to tell me about Ralph Tobin, that he had gone out with colored women. I couldn't stand for a thing like that, so I am going to separate from him." She said she found it very difficult to get along with Nan; that she couldn't be boss in her own home; that she couldn't do as she wanted to, that she never had any peace. She said, "Nan has separated me from everyone that I have cared for. I could have been happy with Claude but Nan broke that up. The only way we can get away from that is to go to Texas because if I stay back there she will separate Ralph and I." She said, "if you folks will come to Texas with Ralph and I, I will see that you never want for the rest of your lives."
J. Morris Yeakle: p. 209. Never complained about her sister, quite the reverse. She gave me to understand that Mr. Tobin came to her with about $70,000 worth of expenses in buying a ranch, which was turned over to him when she got a divorce from him. Mrs. Tobin's mental capacity was A-1. It couldn't have been superior. Denies that he ever asked her "why in the hell don't you throw them out?"
Nan C. Wylie: p. 241. Never discussed the matter of wills. Never told her how she ought to leave her property. Didn't know she had a will until it was handed to me after her death. *Page 604 
She told me, "Nan, you never gouge me like some of the rest of them." She told me he (Fritze) beat her and knocked her down. We had been estranged for a few months. She wasn't peculiar. She was a strong-minded capable woman.
The general rule concerning such statements and declarations is that:
"Statements and declarations of a testator not made at the time of the execution of his will are not admissible as evidence of facts from which undue influence may be inferred; but such statements and declarations, although not made at the time of executing the will, are admissible to indicate the testator's state of mind and the effect thereon of any influence which may have been exerted." 1 R.C.L. 505.
"In a will contest, the testator's declarations afford no substantive proof of undue influence, and before the caveators
can recover they must prove by evidence other than the testator's declarations that undue influence was actually exerted over him."28 R.C.L. 153.
That is the law in this state.
In In re Cooper, 75 N.J. Eq. 177, Chancellor Pitney, in the prerogative court, after quoting Judge Mills' opinion in full, said:
"Counsel for the appellants do not controvert the principle of law adopted by the court below as applicable to the case. The contention is that the learned judge erred in his conclusions of fact. My examination of the case convinces me that those conclusions are fully supported by the evidence, and that the respondent Axtell fairly sustained the burden of showing that the will was the product not of undue influence, but of the free and independent judgment of the testatrix. The decree under review will be affirmed."
This case was affirmed by a per curiam opinion in the court of errors and appeals, sub nom. Harrison v. Axtell, 76 N.J. Eq. 614.
In that case Judge Mills said:
"In Marx v. McGlynn, 88 N.Y. 374, Mr. Justice Earl held that diaries kept and letters written by a testator, either before or after the execution of the will, while proper evidence,as bearing upon the mental capacity and the condition *Page 605 of mind of the testator, with reference to the object of his bounty, are not competent evidence of the facts stated in them, or to prove fraud or undue influence. They are in the nature of hearsay evidence, declarations of the deceased, which are incompetent for the purpose of defeating or destroying the will or any of its provisions. They are competent only as bearing upon the condition of the mind of the testator at the time of the execution of the will. They may be given in evidence for the purpose of showing his relations to the people around him, andto the persons named in the will as beneficiaries. They are, however, entitled to no weight in proving external acts, either of fraud or undue influence."
This same rule was announced by the court of errors and appeals, in Rusling v. Rusling, 36 N.J. Eq. 603, in which it was held:
"In order to show the testator's mental state at any given time, his declarations at that time are competent, because the conditions of the mind are revealed to us only by its external manifestations, of which speech is one. Likewise, the state of mind at one time is competent evidence of its state at other times not too remote, because mental conditions have some degree of permanency. Hence, in an inquiry respecting the testator's state of mind, before or pending the exertion of the alleged influence, his words, as well as his other behavior, may be shown for the purpose of bringing into view the mental condition which produced them, and, through that, the antecedent and subsequent conditions. To this extent his declarations have legal value. But for the purpose of proving matters not related to his existing mental state, the assertions of the testator are mere hearsay. They cannot be regarded as evidence of previous occurrences, unless they come within one of the recognized exceptions to the rule excluding hearsay testimony. * * * Leaving out of view, then, any declarations of the testator, as evidence of attempts to influence his testamentary purposes, there is no evidence suggesting such influence."
In State v. Ready, 78 N.J. Law 599, court of errors and appeals, Chief-Justice Gummere, in commenting upon Rusling v.Rusling, supra, said: *Page 606 
"In the case of Rusling v. Rusling, 9 Stew. Eq. 603, the question was again touched upon by this court. A caveat had been filed against the will of Gershom Rusling, deceased, upon the ground that it was the product of undue influence. Thecaveators offered to prove declarations of the testator respecting the conduct toward him of the favored legatees. The purpose of the offer was to prove the facts stated by the deceased. On the trial in the court of first instance, before the late Chief-Justice Beasley and a jury, that distinguished jurist stated in his charge that the declarations were not competent for that purpose; that they were only competent for the purpose of showing the effect upon the testator of the exercise of the alleged power or dominion which the favored legatees were said to possess over him. Added weight is given to the chief-justice's exposition of the law by the fact that he presided in this court when Harris v. Vanderveer's Executor was decided. Chancellor Runyon, when the case came into the prerogative court for review, thus dealt with the question: `That charge (i.e., the charge of the chief-justice to the jury) was in accordance with the settled law on the subject in this state, although it has never been so declared, indeed, by the court of last resort.' See his opinion.8 Stew. Eq. 129. When the case came into this court Mr. Justice Dixon, delivering the unanimous opinion of the court, thus deals with the question (at p. 607): `These declarations are not admissible as evidence of the facts which they were offered to prove. When undue influence is set up in impeachment of a will the ground of invalidity to be established is, that the conduct of others has so operated upon the testator's mind as to constrain him to execute an instrument to which, of his free will, he would not have assented. This involves two things — first, the conduct of those by whom the influence is said to have been exerted; second, the mental state of the testator, as produced by such conduct, which may require a disclosure of the strength of mind of the decedent and his testamentary purposes both immediately before the conduct complained of and while subjected to its influence. In order to show the testator's mental state at any given time, his *Page 607 
declarations at that time are competent, because the conditions of the mind are revealed to us only by its external manifestations, of which speech is one. Likewise the state of the mind at one time is competent evidence of its state at other times not too remote, because mental conditions have some degree of permanency. Hence, in an inquiry respecting the testator's state of mind, before or pending the exertion of the alleged influence, his words as well as his other behavior, may be shown for the purpose of bringing into view the mental condition which produced them, and, through that, the antecedent and subsequent conditions. To this extent his declarations have legal value. But for the purpose of proving matters not related to his existing mental state, the assertions of the testator are mere hearsay. * * * There is no legal principle upon which they can be treated as evidence of acts constituting undue influence. The weight of authority touching this matter is in accordance with true principle, but it is not necessary here to review the cases. InBoylan ads. Meeker, 4 Dutch. 274, Mr. Justice Whelpley refers to many of them, examining the point with much care; and more recently, in Shailer v. Bumstead, 99 Mass. 112, Mr. Justice Colt has discussed the subject with great clearness of discrimination, the conclusions in both opinions being that at which we have arrived.' From a cursory reading of the concluding portion of this extract it might be thought that this court concurred completely in the views expressed by Mr. Justice Whelpley in Boylan ads. Meeker Case. But this is clearly not so. The only question for determination in the Rusling Case was whether the declarations of a testator were evidential of the facts referred to in them. The conclusion reached was that they were not. This conclusion is identical with that reached both inBoylan ads. Meeker and in Shailer v. Bumstead. The question whether such declarations were admissible to show the state of mind of a testator — his testamentary intentions — was not before the court, and what was said by Mr. Justice Dixon upon that point, as well as what was said by Chief-Justice Beasley and Chancellor Runyon in the earlier stages of the *Page 608 
case, was purely obiter. That Mr. Justice Dixon's view upon that point was no part of the conclusion which he declared was the same as that expressed in Boylan ads. Meeker andShailer v. Bumstead is apparent, not only from the fact that those two cases are absolutely opposed to one another upon this question, as the above-cited extracts from the opinions in those cases show, but also from the further fact that the conclusion in the Boylan ads. Meeker Case upon this point is opposed to his own obiter expressions in the case he was considering.
"In Gordon's Case, 5 Dick. Ch. Rep. 397, 424, declarations of the testator `which made for or against the authenticity of the disputed will,' were held by Chancellor McGill, sitting as ordinary, to be incompetent, on the authority of Boylan ads.Meeker and Rusling v. Rusling. The purpose for which the declarations were offered is not stated in the opinion of the court. It is impossible, therefore, to determine whether the case is an authority against the admissibility of the declarations of the testator for the purpose of proving his intention at the time they were made, with relation to the making or not making a testamentary disposition of his property. It is also to be observed that the decree of the prerogative court was affirmed, when the case came into this court, without any expression of opinion on the subject of the propriety of excluding these declarations. Gordon v. Old, 7 Dick. Ch. Rep. 317.
"In Davis v. Elliott, 10 Dick. Ch. Rep. 473, Chancellor McGill, sitting in the prerogative court, took into consideration declarations of the testatrix showing her testamentary intentions with relation to the caveator in determining the question whether the alleged will was a forgery. This decision, rendered five years after that promulgated by him in the Gordon Case, would seem to justify the inference that the later case was not considered by him to be in conflict with the earlier one, and that the rejected declarations in the Gordon Case were not offered to prove the state of mind of the testator, but for the same purpose which led to their rejection in the Rusling Case, viz., as evidence of the facts declared. *Page 609 
"From this resume of the New Jersey cases it appears that the prerogative court, from its decision in Day v. Day, 3 N.J. Eq. 549,
in the year 1831 down to that in Davis v. Elliott in 1897, has consistently held to the view (with the possible exception of the Gordon Case) that antecedent declarations of the testator are competent for the purpose of showing that the provisions of a contested will are contrary to or in harmony with his intentions, views and feelings as exhibited by those declarations; that the supreme court at one time held the same view, but subsequently repudiated it, and held that such declarations were competent only for the purpose of showing mental capacity or lack of it in the testator, and that this court has not until this time been called upon definitely to decide the question, but has obiter expressed the view that such declarations are competent for the purpose of showing the state of mind of the testator when his state of mind at the time of making the declarations is germane to the issue being tried."
The Tennessee supreme court held that ante-testamentary declarations of a testator are not admissible as substantive evidence of undue influence in the making of the will. Hobson
v. Moorman, 115 Tenn. 73; 90 S.W. Rep. 152; 3 L.R.A. (N.S.)749. In an extensive case note under this case it is said:
"The rule and distinction are thus stated in Wall v.Dimmitt, 114 Ky. 923; 72 S.W. Rep. 300: `The law is well settled in this state, and is abundantly supported by the text writers and decisions of other states, that the statements or declarations of a testator, whether made before or after the execution of the will, are not competent as direct and substantive evidence of undue influence, or to show that the will was procured thereby, but are admissible to show the mental condition of the testator at the time of the making of the will and her susceptibility to influences by which she was surrounded at the time.' This is said to be the law in Harring v. Allen,25 Mich. 505; Waterman v. Whitney, 11 N.Y. 157, and In reTownsend, 122 Iowa 255; 97 N.W. Rep. 1108." *Page 610 
The same rule is promulgated in the North Carolina supreme court in Linebarger v. Linebarger, 143 N.C. 229, and in a note in 10 Am. Eng. Ann. Cas. 600, citations from a number of states, including In re Davis (Byrnes v. Gibson), decided by the late Chancellor Magie, 73 N.J. Eq. 617.
It will be noticed that all of the testimony quoted refers entirely to statements and declarations made by Mrs. Tobin, except the testimony of (a) Florence Barrett, who said that she could not see her privately for the past eight years. There was nothing in her testimony, however, that would indicate any undue influence. (b) Mrs. Aimee Craig, who said that Mrs. Wylie said, "she can't make a move but what I know it." (c) Charles Chisholm testified that contentions were between Mrs. Tobin, herself, and Mrs. Wylie in the form of very frequent quarrels. (d) Alice Hailstock said that Mrs. Tobin and Mrs. Wylie frequently had quarrels and once it was over a month that Mrs. Wylie didn't speak to Mrs. Tobin, didn't even go in her room where she was.
This was insufficient to show undue influence, the only intimation of such being the testimony of Mrs. Barrett and Aimee Craig, to the effect that Mrs. Wylie was watching over Mrs. Tobin.
Jay C. Kline testified that Mrs. Wylie was never present at interviews he had with Mrs. Tobin concerning her financial affairs. The testimony of the nurse is that Mrs. Tobin and Mrs. Wylie were friendly and never quarreled; of Dr. Earl B. Craig that "there was an affection between the two that was so deep that really I could not describe it." Carl B. Fritze testified on page 151: "I had asked Mrs. Serfass (Mrs. Tobin) to show me the historical parts of Philadelphia, not knowing Philadelphia, and she suggested that she would do that that day, and evidently there was a reason for Mrs. Wylie to complain about it, because she got very furiously angry at Mrs. Serfass (Mrs. Tobin) wanting to go with me alone, and they had words, and she said, `you are nothing else but a dirty rotten degenerate,' and that broke up the home." Nan Wylie, the beneficiary, testified: "Never discussed the matter of wills, never told her how she ought to leave her *Page 611 
property. Never knew that she had a will until it was handed to me after her death; that she was not peculiar, she was a strong-minded, capable woman."
Excluding the declarations and statements of the testatrix, there is no testimony sufficient to prove the existence of undue influence.
The court below allowed proctor for contestants a fee of $7,500 and proctors for proponents a fee of $25,000. It is claimed on the appeal on behalf of the executors that the former allowance is excessive.
In In re Allen, 107 N.J. Eq. 561, I quoted Chancellor Walker, as ordinary, In re Wandell, 92 N.J. Eq. 195, as saying:
"An allowance made by the orphans court of counsel fees on a contest over the probate of a will ought not to be overthrown by this court on appeal, unless it quite conclusively appears that the allowance was excessive (in which case it should be reduced), or that the contest below developed no reasonable ground for further litigation, and where the decision of the orphans court that the unavailing contest was reasonable in that tribunal can be upheld, it should be; and where the judge of the orphans court, who tried the cause and saw and heard the witnesses, concludes there was reasonable ground of contest there, he should be upheld, if he may be, without doing violence to the case as it appears upon the record.
"One provision of the statute is that the contesting party shall pay the costs and expenses of the litigation unless he offers no evidence other than that of the subscribing witnesses. Therefore, a party who would inherit in case of intestacy may, in any event, examine the subscribing witnesses without peril of costs being visited upon him; but, where he goes on with an affirmative contest, he shall not have costs out of the estate (unless the trial court concludes that there was reasonable ground therefor); and, although the contest may be reasonable in the orphans court, yet, if the losing party is not satisfied with its judgment and appeals to this court, as is his right, this court will determine whether *Page 612 
or not the contest here was reasonable, quite irrespective of the decision in the court below as to the reasonableness of the contest there."
The allowance of $25,000 to counsel for executors will be reduced to $15,000.
Upon the appeal of the executors concerning the proctor's fee allowed to William I. Garrison, proctor for Aimee Craig, guardian, c., the finding of the orphans court that there was reasonable ground of contest should be upheld as above stated, but the amount will be reduced from $7,500 to $5,000.
With these modifications, the order of the orphans court will be affirmed. *Page 613